The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
March 18, 2021

**2021COA36**

**No. 19CA1798, *CO₂ Committee v. Montezuma County* — Energy and Environment — Oil and Gas; Taxation — Property Tax — Valuation of Oil and Gas Leaseholds and Lands — Valuation for Assessment; Jurisdiction of Courts — Standing**

In this oil and gas leasehold tax case, a division of the court of appeals considers whether a nonoperating fractional interest owner in an oil and gas unit, who pays real property taxes on its leasehold interest, has standing to claim that its due process rights were violated when it did not receive individual notice of or an opportunity to challenge a retroactive assessment and increased tax liability. The division concludes, as a matter of first impression, that a nonoperating fractional interest owner who has been denied the panoply of rights afforded a taxpayer under the governing statutes and guidelines — including to receive notice of and to protest a retroactive assessment or to seek an abatement of a

retroactively increased tax — has standing to claim a violation of those rights. The division reverses the district court's order dismissing the complaint for lack of standing.

COLORADO COURT OF APPEALS       **2021COA36**

Court of Appeals No. 19CA1798
Montezuma County District Court No. 18CV30100
Honorable Todd Jay Plewe, Judge

$CO_2$ Committee, Inc.,

Plaintiff-Appellant,

v.

Montezuma County, Colorado; Montezuma County Board of County
Commissioners; Montezuma County Board of Equalization; Montezuma County
Assessor; and Montezuma County Treasurer,

Defendants-Appellees.

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division II
Opinion by JUDGE BROWN
Román and Welling, JJ., concur

Announced March 18, 2021

Cogswell Law Offices, John M. Cogswell, Buena Vista, Colorado, for Plaintiff-
Appellant

Dufford, Waldeck, Milburn & Krohn, L.L.P., Nathan A. Keever, Jon T. Burtard,
Grand Junction, Colorado, for Defendants-Appellees

¶ 1     This oil and gas leasehold tax case requires us to determine whether a nonoperating fractional interest owner in an oil and gas unit who pays real property taxes on its leasehold interest has standing to claim that its due process rights were violated when it did not receive individual notice of or an opportunity to challenge a retroactive assessment and increased tax.  We conclude, as a matter of first impression, that a nonoperating fractional interest owner who has been denied the panoply of rights afforded a taxpayer under the governing statutes and guidelines — including the rights to receive notice of and to protest a retroactive assessment or to seek an abatement of a retroactively increased tax — has standing to claim a violation of those rights.

¶ 2     The plaintiff in this case, $CO_2$ Committee, Inc. (CO2), is a nonprofit corporation whose members include nonoperating fractional interest owners in the McElmo Dome Unit (the Unit) who pay real property taxes to Montezuma County.[1]  Following an audit,

_____

[1] Based on the record before us, the precise composition of CO2's membership is unclear.  Because the district court did not take evidence or make jurisdictional findings, however, we accept as true the allegations in the complaint.  *Jones v. Samora*, 2016 COA 191, ¶ 21 ("When deciding whether a party has standing, 'all averments

Montezuma County[2] retroactively increased the assessed value of the taxable real property in the Unit for tax year 2008, which resulted in an increased tax liability for the Unit.

¶ 3    On behalf of its members, CO2 filed a complaint alleging that Montezuma County violated its members' due process rights by failing to provide each member individual notice of and an opportunity to challenge the retroactive assessment.  The district court dismissed the complaint for lack of standing.

¶ 4    We conclude that CO2's members include nonoperating fractional interest owners who are taxpayers with standing to pursue the claims asserted in the complaint.  Accordingly, we reverse the district court's order dismissing the complaint and remand the case for further proceedings.

---

of material fact in a complaint must be accepted as true.'" (quoting *State Bd. for Cmty. Colls. & Occupational Educ. v. Olson*, 687 P.2d 429, 434 (Colo. 1984))); *cf. Medina v. State*, 35 P.3d 443, 452 (Colo. 2001) (explaining that a trial court is authorized to conduct a hearing and to resolve disputed jurisdictional facts).
[2] Defendants are Montezuma County, Montezuma County Board of County Commissioners, Montezuma County Board of Equalization, Montezuma County Assessor, and Montezuma County Treasurer (collectively, Montezuma County).

2

## I.    Background

¶ 5    An estate in minerals such as oil and gas is a form of real property.  § 24-65.5-101, C.R.S. 2020; § 39-1-102(14), C.R.S. 2020.  When the owner of a mineral estate leases the right to extract oil and gas from the land,

> the lease may create various interests, which generally take the form of either a working interest (the oil and gas company's right to extract the minerals and develop them for profit) or a royalty interest (the estate owner's right to receive a share of the production or a share of the value of the proceeds of production).

*Kinder Morgan CO_2 Co., L.P. v. Montezuma Cnty. Bd. of Comm'rs*, 2017 CO 72, ¶ 4 (*KM II*) (citing 1 Patrick H. Martin & Bruce M. Kramer, *Williams & Meyers, Oil and Gas Law* §§ 201-216 (2014 ed.)).

¶ 6    In the oil and gas context, a "unit" is "a consolidation of working interests that extract resources from a single geological reservoir.  Units are created for the purpose of efficiently extracting resources from the reservoir through coordinated engineering and operation, often by a single operator."  *KM II*, ¶ 12 n.4 (citing 6 Martin & Kramer, § 901); *see also* § 39-10-106(5), C.R.S. 2020

3

("'[U]nit' means any single oil, gas, or other hydrocarbon well or field which has multiple ownership, or any combination of oil, gas, or other hydrocarbon wells, fields, and properties consolidated into a single operation, whether by a formal agreement or otherwise . . . ."). The operator is the "person responsible for the day-to-day operation of a well by reason of contract, lease, or operating agreement." 3 Div. of Prop. Tax'n, Dep't of Loc. Affs., *Assessor's Reference Library*, at 6.25 (rev. Jan. 2008) (ARL).[3]

¶ 7    The Unit at issue here is a consolidation of working interests in a large deposit of pure carbon dioxide in Montezuma and Dolores Counties. *KM II*, ¶ 12 n.4 (citing Colorado Oil and Gas Conservation Commission Order No. 389-1 (Nov. 17, 1982)). Although several other individuals and entities own various working

---

[3] In this opinion, we refer to Volume 2 of the ARL, the "Administrative and Assessment Procedures Manual," revised December 2008, and Volume 3 of the ARL, the "Land Valuation Manual," revised January 2008. Volume 2 "is an aid to assessors in valuing and assessing taxable property." 2 ARL Preface, at ii. Volume 3 "provide[s] a reference source for appraisal and assessment policies and procedures for the valuation of land according to the Colorado Constitution and statutes." 3 ARL Preface, at ii. Current and historical versions may be found online: Colo. Dep't of Loc. Affs., *Assessors' Reference Library Manuals*, https://perma.cc/AVY8-5ME7.

interests and royalty interests in the Unit, Kinder Morgan $CO_2$ Company, L.P. (Kinder Morgan) is the largest working interest owner and the sole operator of the Unit.  Kinder Morgan owns a 44% fractional interest in the Unit.  CO2's members are royalty owners, overriding royalty owners, and nonoperating working interest owners collectively owning an 11.224% fractional interest in the Unit.

¶ 8     As the Unit operator, Kinder Morgan extracts and compresses the carbon dioxide and then transports it by pipeline to Texas where it is sold for use in oil and gas operations.  *See id.* at ¶¶ 12-13.  Kinder Morgan also manages the Unit's development by paying for the facilities and equipment and supplying labor to produce the carbon dioxide, and then billing the other working interest owners for its expenses in operating the Unit and arranging for transportation of the carbon dioxide to the point of sale.  *Id.* at ¶ 13.

¶ 9     As the Unit operator, Kinder Morgan also files an annual property tax statement for and pays property taxes on behalf of all interest owners in the Unit.  *Id.*; *see also* § 39-7-101(1), C.R.S. 2020; § 39-10-106.

¶ 10     Oil and gas leaseholds are taxed as real property. *KM II*, ¶ 4; *see also* Colo. Const. art. X, § 3(1)(b); § 39-7-102, C.R.S. 2020. "Unlike most property interests, however, the value of an oil and gas leasehold interest comes not from the physical space or land the leasehold occupies, but rather, from the quantity and value of oil and gas underground." *KM II*, ¶ 4. That value, in turn, depends on the "selling price of the gas or oil 'at the wellhead,'" *id.* at ¶ 7; *see also* §§ 39-7-101(1), -102, a term we discuss in greater detail below in Part II.C.2.b.

¶ 11     In 2009, following an audit of the annual property tax statement Kinder Morgan filed for the Unit for tax year 2008, Montezuma County determined that Kinder Morgan had underreported the selling price at the wellhead by deducting costs that it was not allowed to deduct. *KM II*, ¶¶ 15-16. Consequently, Montezuma County retroactively increased its valuation of the leaseholds in the Unit by approximately $57 million, increasing the Unit's property tax liability by over $2 million. *Id.* at ¶ 16.

¶ 12     Kinder Morgan paid the increased taxes under protest, petitioned for and was denied an abatement, and unsuccessfully appealed the retroactive assessment all the way to the Colorado

6

Supreme Court. *Id.* at ¶¶ 17, 46; *see Kinder Morgan CO$_2$ Co., L.P. v. Montezuma Cnty. Bd. of Comm'rs*, 2015 COA 72, ¶ 44 (*KM I*), *aff'd*, *KM II*. In *KM II*, the supreme court concluded that "the statutory scheme governing property taxation of oil and gas leaseholds and lands authorizes the retroactive assessment of taxes when an operator has underreported the selling price of oil or gas," *KM II*, ¶ 40, and affirmed the Board of Assessment Appeals' conclusion that Kinder Morgan had underreported the selling price at the wellhead, *id.* at ¶ 46.

¶ 13    Ultimately, Kinder Morgan billed the nonoperating fractional interest owners, including CO2's members, for their proportionate shares of the increased taxes. CO2 alleged in its complaint that Montezuma County has since retroactively increased its valuation of the leaseholds in the Unit and retroactively assessed taxes against the Unit for tax years subsequent to 2008. Kinder Morgan has paid the increased taxes and billed the fractional interest owners, including CO2's members, for their proportionate shares. CO2 alleged that its members have collectively been assessed retroactive taxes estimated at $500,000 per year.

7

¶ 14     During the audit of the 2008 tax statement, the retroactive assessment, the petition for abatement, and the subsequent appeals, Montezuma County communicated only with Kinder Morgan as the operator of the Unit.  It issued special notices of valuation only to Kinder Morgan.  It did not provide individual notice to any other fractional interest owner and no other fractional interest owner participated in the proceedings resulting in the increased tax liability.

¶ 15     According to its complaint, after CO2 received notice from Kinder Morgan that Kinder Morgan had paid increased taxes for the Unit, it attempted to challenge the retroactive assessment on behalf of its members.  In substance, it argued that its members were entitled to deduct the costs that Kinder Morgan was disallowed, so its members did not underreport their selling price at the wellhead. As a result, CO2 argued, Montezuma County improperly increased the taxable value of their interests by retroactively assessing the entire Unit without making individual proportionality computations for each fractional interest owner.

¶ 16     CO2 filed an objection with the Montezuma County assessor pursuant to section 39-5-122, C.R.S. 2020, claiming that

8

Montezuma County wrongfully determined that CO2's members had underreported their selling price at the wellhead beginning with the 2008 tax year. CO2 alleged that Montezuma County responded, claiming it was unable to establish that CO2's members should be treated differently than Kinder Morgan for purposes of computing the selling price at the wellhead, and that separate special notices of valuation have never been provided to CO2's members and were not required.

¶ 17 CO2 then appealed to the board of equalization pursuant to section 39-8-106, C.R.S. 2020, and filed a petition for abatement with the board of county commissioners pursuant to section 39-10-114, C.R.S. 2020. CO2 alleged that Montezuma County responded as follows: "The Montezuma County Assessor's office has not sent Notices of Value [to CO2]. As [CO2] is not identified as a Montezuma County taxpayer, we are not able to provide a hearing at the [b]oard of [e]qualization. Thank you."

¶ 18 Consequently, CO2 commenced the underlying district court litigation against Montezuma County, asserting claims for (1) violation of its members' civil rights, under 42 U.S.C. § 1983; and (2) an injunction requiring Montezuma County to calculate and

9

refund its members' alleged overpayment of taxes and precluding Montezuma County from levying retroactive taxes against its members without delivering actual notice to each member. The thrust of CO2's complaint was that Montezuma County had denied its members due process of law by retroactively increasing their taxes without providing them individual notice of and an opportunity to challenge the retroactive assessment or the opportunity to seek a tax abatement.

¶ 19 Montezuma County filed a motion to dismiss, arguing, among other things, that CO2 was not the real party in interest and that it lacked standing.[4] The district court granted the motion.

¶ 20 On appeal, CO2 contends that the district court erred by (1) dismissing its complaint for lack of standing; (2) concluding that it was not the real party in interest; and (3) denying its post-dismissal motion to amend the complaint. Because we conclude that CO2's members have standing to bring the asserted claims, we

---

[4] Montezuma County also argued that the complaint should be dismissed on the basis of claim and issue preclusion because Kinder Morgan made the same substantive argument when it challenged the retroactive assessment as CO2 makes now. The district court denied the motion to dismiss on these bases.

reverse the court's order dismissing the complaint and remand for further proceedings.

## II. Standing

¶ 21 CO2 contends that the district court erred in dismissing its complaint for lack of standing by concluding that (1) CO2's members were not entitled to due process related to the retroactive assessment proceedings; and (2) CO2's members "were not real parties in interest with standing" and, thus, CO2 was "not a real party in interest [with] standing" to maintain this lawsuit against Montezuma County. We agree.

### A. Standard of Review and Applicable Law

¶ 22 For a court to have jurisdiction over a dispute, the plaintiff must have standing to bring the case. *Ainscough v. Owens*, 90 P.3d 851, 855 (Colo. 2004). Standing is a threshold issue that must be satisfied for a court to decide a case on the merits. *Barber v. Ritter*, 196 P.3d 238, 245 (Colo. 2008).

¶ 23 Whether a party has standing is a question of law that we review de novo. *Id.* And when deciding whether a party has standing, we must accept as true all averments of material fact in a complaint. *Jones v. Samora*, 2016 COA 191, ¶ 21 (citing *State Bd.*

11

*for Cmty. Colls. & Occupational Educ. v. Olson*, 687 P.2d 429, 434 (Colo. 1984)).

¶ 24    In Colorado, plaintiffs benefit from a relatively broad definition of standing. *Ainscough*, 90 P.3d at 855. To establish standing, a plaintiff must have (1) suffered injury in fact (2) to a legally protected interest. *Id.* (citing *Wimberly v. Ettenberg*, 194 Colo. 163, 168, 570 P.2d 535, 539 (1977)).

¶ 25    "Injury in fact exists if 'the action complained of has caused or has threatened to cause injury.'" *Kreft v. Adolph Coors Co.*, 170 P.3d 854, 857 (Colo. App. 2007) (quoting *Romer v. Colo. Gen. Assembly*, 810 P.2d 215, 218 (Colo. 1991)). An injury in fact may be tangible, such as physical damage or economic harm, or intangible, such as aesthetic issues or the deprivation of civil liberties. *Ainscough*, 90 P.3d at 856. A remote possibility of future injury or an injury that is overly indirect or incidental is insufficient. *Barber*, 196 P.3d at 246.

¶ 26    If the plaintiff establishes an injury in fact, "the court must then determine whether this injury is to a legal interest which entitles the plaintiff to judicial redress." *Olson*, 687 P.2d at 435. "Resolution of this second prong of standing basically rests on a

normative judgment that the injury is or is not actionable." *Id.* The question is whether the plaintiff has a claim for relief under the constitution, the common law, a statute, or a rule or regulation. *Ainscough,* 90 P.3d at 856; *see also Kreft,* 170 P.3d at 858 ("A legally protected interest must emanate 'from a constitutional, statutory, or judicially created rule of law that entitles the plaintiff to some form of judicial relief.'" (quoting *Bd. of Cnty. Comm'rs v. Bowen/Edwards Assocs., Inc.,* 830 P.2d 1045, 1053 (Colo. 1992))).

¶ 27 An organization may have standing to assert claims on behalf of its members if it shows that (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Jones,* ¶ 29.

### B. Additional Background

¶ 28 In its motion to dismiss, Montezuma County argued that CO2 lacked standing because its members lacked standing, and that its members lacked standing because Kinder Morgan, as the Unit

13

operator, is the sole entity responsible for paying taxes for the Unit and seeking abatement of those taxes.

¶ 29    In response, CO2 acknowledged that Kinder Morgan, as the Unit operator, was exclusively obligated to submit the annual property tax statement and to pay taxes on behalf of all nonoperating fractional interest owners in the Unit, but it contended that nothing in the governing statutes or guidelines authorized Montezuma County "to deal only with the operator when a retroactive assessment is in process." Instead, it argued that Montezuma County was required to provide notice to each of its members, as taxpayers, and that each member should be able to challenge the assessment or to seek an abatement.

¶ 30    The district court concluded that CO2 "is not a real party in interest and lacks standing to maintain this lawsuit — because the members of [CO2] are not real parties in interest with standing to bring this suit against Montezuma County." It concluded that the members' alleged injury was not "to a legally protected or cognizable interest" because the statutory scheme governing oil and gas taxation "vests all legal and constitutional rights to contest the tax

14

assessed and levied with the unit operator" and "require[s] Montezuma County to interact only with the unit operator."

### C. Analysis

¶ 31 To determine whether CO2 has standing as an organization, we must first determine whether CO2's members would have standing to sue in their own right. *Jones*, ¶ 29. Thus, we must determine whether CO2 sufficiently alleged that its members suffered an injury in fact to a legally protected interest emanating from the constitution, a statute, a rule, a regulation, or the common law. *Kreft*, 170 P.3d at 858.

### 1. Injury in Fact

¶ 32 To satisfy the actual injury requirement for standing, CO2 must demonstrate that the challenged action caused or threatened to cause actual injury to its members. *Kreft*, 170 P.3d at 858.

¶ 33 In its complaint, CO2 alleged that Montezuma County violated its members' due process rights, guaranteed by the Fifth and Fourteenth Amendments, by retroactively increasing the assessed value of their property without providing the members notice and an opportunity to challenge the assessment. It further alleged that

15

its members actually paid increased taxes as a result of the retroactive assessment.

¶ 34　We agree with the district court that CO2 sufficiently alleged that its members suffered an injury in fact — both the denial of due process and an economic loss. *See Morgan v. McCotter*, 365 F.3d 882, 888-89 (10th Cir. 2004) (where due process protections would have alleviated harm, the plaintiff has alleged an injury in fact (citing *Rector v. City & Cnty. of Denver*, 348 F.3d 935, 943-44 (10th Cir. 2003))); *Hughey v. Jefferson Cnty. Bd. of Comm'rs*, 921 P.2d 76, 78 (Colo. App. 1996) (Allegations that plaintiff paid taxes assessed on property "supply sufficient evidence of an economic injury to satisfy the requirement for an injury in fact.").

## 2.　Legally Protected Interest

¶ 35　To satisfy the second criterion for standing, CO2 must demonstrate that the injury allegedly suffered by its members is to a legally protected interest. *Ainscough*, 90 P.3d at 856.

¶ 36　"Generally, the one who bears the financial burden of a tax is a party aggrieved and thus has standing to challenge an assessment." *Hughey*, 921 P.2d at 78. But here, the district court concluded that "the statutory scheme promulgated vests all legal

16

and constitutional rights to contest the tax assessed and levied with the unit operator" and that the "Colorado legislature does not grant the non-operating interest owners any right or recourse to request an audit or to contest the tax levied by the county."

¶ 37    To resolve this issue, we must look to the Colorado statutes and guidelines governing the assessment and taxation of oil and gas leaseholds and land and determine whether CO2's members have the right to notice and an opportunity to challenge the retroactive assessment or to seek an abatement of the increased tax. We conclude that each nonoperating fractional interest owner who pays taxes is entitled to the panoply of rights afforded a "property owner," "person," or "taxpayer" under the review, audit, protest, abatement, and appeal procedures detailed in the statutes and guidelines. Thus, we conclude that the injury allegedly suffered by CO2's members is to a legally protected interest.

a.    Rules of Statutory Interpretation

¶ 38    We review questions of statutory interpretation de novo. *Traer Creek-EXWMT LLC v. Eagle Cnty. Bd. of Equalization,* 2017 COA 16, ¶ 8. Our primary goals in interpreting a statute are to discern and give effect to the General Assembly's intent. *Id.* at ¶ 9. When

17

construing an administrative regulation, we apply the same rules of construction that we would when interpreting a statute. *Williams v. Colo. Dep't of Corr.*, 926 P.2d 110, 112 (Colo. App. 1996).

¶ 39 We first look to the ordinary and common meaning of the language used, giving effect to every word whenever possible. *Cendant Corp. & Subsidiaries v. Dep't of Revenue*, 226 P.3d 1102, 1106 (Colo. 2009). We read words and phrases in context and construe them according to the rules of grammar and common usage. § 2-4-101, C.R.S. 2020; *Gagne v. Gagne*, 2014 COA 127, ¶ 25. And we read and consider the statutory and regulatory scheme as a whole, giving consistent, harmonious, and sensible effect to all its parts. *Cendant Corp.*, 226 P.3d at 1106.

### b. Oil and Gas Property Taxation Law

#### i. Valuing Oil and Gas Leaseholds

¶ 40 To ensure uniform taxation premised on uniform assessment of property values, the General Assembly enacted article 7 of title 39, which governs the valuation of oil and gas leaseholds and lands

for the purpose of property taxation.[5] *Yuma Cnty. Bd. of Equalization v. Cabot Petroleum Corp.*, 856 P.2d 844, 848 (Colo. 1993); *see also* § 39-3-103(2), C.R.S. 2020. The General Assembly also delegated certain authority to the Property Tax Administrator as the head of the Division of Property Taxation in the Department of Local Affairs. *See* §§ 39-2-101, -109, C.R.S. 2020.

¶ 41     As relevant here, the Property Tax Administrator has the authority to prepare and publish manuals, appraisal procedures, and instructions concerning methods of appraising and valuing land, and to prepare and publish guidelines concerning the audit and compliance review of oil and gas leasehold properties for property tax purposes. § 39-2-109(1)(e), (k). To this end, the Property Tax Administrator prepares and publishes the ARL, a series of manuals addressing Colorado property assessment. *See* 2 ARL Preface, at ii; 3 ARL Preface, at ii. The manuals, procedures, instructions, and guidelines published by the Property Tax Administrator must be used by assessors in valuing taxable

---

[5] For real property classification, "oil and gas leaseholds and lands includes all drilled wells producing any kind of petroleum or natural gas product, such as oil, gas, or helium and carbon dioxide." 3 ARL at 6.21.

19

property.  § 39-2-109(1)(e), (k); *Huddleston v. Grand Cnty. Bd. of Equalization*, 913 P.2d 15, 17 (Colo. 1996) ("[T]he manuals are binding on the county assessors.").

¶ 42     Under this statutory and regulatory scheme, oil and gas leaseholds and lands are valued based on the selling price of the oil or gas "at the wellhead" during the preceding calendar year.  §§ 39-7-101(1)(d), -102(1)(a).  The "selling price at the wellhead" means the "net taxable revenues realized by the taxpayer for sale of the oil or gas, whether such sale occurs at the wellhead or after gathering, transportation, manufacturing, and processing of the product."  § 39-7-101(1)(d); *see also* 3 ARL at 6.25.  And "net taxable revenues" are "equal to the gross lease revenues, minus deductions for gathering, transportation, manufacturing, and processing costs borne by the taxpayer pursuant to guidelines established by the [Property Tax Administrator]."  § 39-7-101(1)(d); *see also* 3 ARL at 6.25.  The guidelines regarding what may be deducted from gross lease revenues are set forth in the ARL.  *See, e.g.,* 3 ARL at 6.35-6.47.

20

### ii. Annual Property Tax Statement

¶ 43 Every operator of any producing oil or gas unit must file an annual property tax statement for the unit by April 15 of each year.[6] § 39-7-101(1)(d); § 39-7-102(1)(a), C.R.S. 2020; 3 ARL at 6.25; *see also* 3 ARL at 6.21 (specifying that the statement required to be filed by April 15 of each year is an "Oil and Gas Real and Personal Property Declaration Schedule"). The annual statement or declaration schedule must include, among other things,

> (a) The wellhead location thereof and the name thereof, if there is a name;
>
> (b) The name, address, and fractional interest of the operator thereof;
>
> (c) . . . [T]he quantity of gas measured in thousands of cubic feet, sold or transported from the wellhead during the calendar year immediately preceding . . . ;
>
> (d) The selling price at the wellhead . . . [; and]
>
> (e) The name, address, and fractional interest of each interest owner taking production in kind and the proportionate share of total unit revenue attributable to each interest owner who is taking production in kind[.]

---

[6] If there is no operator, every person owning any producing oil or gas leasehold or lands is required to file the annual statement. § 39-7-101(1), C.R.S. 2020.

§ 39-7-101(1); *see also* 3 ARL at 6.21.[7]

### iii. Assessor Valuation

¶ 44     Based on the annual statement filed by the operator, rather than on its own independent verification of the volume and value of the oil and gas produced, the county assessor determines the value of the leaseholds and lands in the unit for assessment.  § 39-7-102(1)(a); *KM II,* ¶ 30 ("[T]he assessor relies on information that is self-reported by the operator, typically without the means to independently verify the volume and value of oil and gas produced at the leasehold.").

¶ 45     "[F]or taxable personal property on oil and gas leaseholds or lands for which the operator has filed the statement required by section 39-7-101(1)," the assessor must send a notice of valuation

---

[7] By March 15 of each year, each nonoperating interest owner may submit to the operator a report of the actual net taxable revenues received at the wellhead by such owner for production taken in kind.  § 39-7-101(1.5).  If the nonoperating interest owner timely submits this information, the operator must use it to determine the selling price at the wellhead to be reported in the annual statement. *Id.*  But, if the nonoperating interest owner does not timely submit this information, "the amount of tax for which such nonreporting, nonoperating interest owner is liable shall be calculated based on the selling price at the wellhead reported by the operator." *Id.*; *see also* 3 ARL at 6.22-6.23.

of the property "only to the operator, who shall accept it." § 39-5-121(1.5)(b), C.R.S. 2020; *see also* § 39-7-102.5, C.R.S. 2020 (indicating that oil and gas leaseholds and lands valued pursuant to article 7 follow the schedule for personal property regarding notices of valuation and appeals of valuation). Even though the operator is obligated to accept the notice of valuation, that acceptance "shall not be construed as an indication that the operator agrees with the amount of the actual value of the property stated in the notice or as obligating the operator to pay the tax attributable to property in which the operator has no ownership." § 39-5-121(1.5)(b).

### iv. Protest and Appeal of Valuation

¶ 46    Pursuant to section 39-5-122(2), "[i]f any person is of the opinion that [their] property has been valued too high" by the assessor, they may file a written "letter of objection and protest" with the assessor's office and be heard. If the protest is denied, the assessor must mail a notice of determination to the "person presenting the objection and protest so denied," stating the reasons for declining to change the valuation. § 39-5-122(2); *see also* 2 ARL

23

at 5.3.[8]  Any person whose objection and protest has been denied may appeal to the county board of equalization.  § 39-5-122(3); *see also* § 39-8-106(1), (3); 2 ARL at 5.3.  If the board of equalization denies the petition, the petitioner may appeal.  *See* §§ 39-8-108(1)-(3), -107(1), C.R.S. 2020; *see also* § 24-4-106(9), (11), C.R.S. 2020; 2 ARL at 5.6.

     v.     Payment of Taxes on Fractional Interests in Lands

¶ 47    When oil and gas wells are owned by multiple owners and operated as a unit, "the owner of each fractional interest in such units shall be liable for the same proportion of the tax levied against the total unit that his net taxable revenues received therefrom bears to the total net taxable revenues received from such unit."  § 39-10-106(1).  Once taxes are levied, the unit operator is obligated to collect a proportionate share from each fractional interest owner

---

[8] Although ARL Volume 3 is the manual specific to land valuation, it provides that "[v]aluation and/or assessment issues not pertaining directly to the valuation of land may be referenced to one of the other ARL manuals, as appropriate."  3 ARL Preface, at ii.  The mechanisms for protesting an assessment or seeking an abatement of a levied tax are general valuation and/or assessment issues, which are addressed in ARL Volume 2.

and remit the tax levied against the entire unit to the treasurer of the county in which the unit is located. § 39-10-106(2).

¶ 48 If the unit operator collects tax from the fractional interest owner as provided by statute, but fails to remit the amounts collected, it becomes liable for such tax, and the fractional interest owner "shall not be subject to any collection and enforcement remedies" for such tax. § 39-10-106(2), (4)(b)(III). Failure of the unit operator to collect tax from the fractional interest owner, however, does not preclude the treasurer from employing "lawful collection and enforcement remedies and procedures against the owner of any fractional interest to collect the tax owed by such owner." § 39-10-106(4)(a).

vi. Abatement of Taxes Levied

¶ 49 Within two years after taxes are levied, a taxpayer may file a petition with the board of county commissioners to request an abatement of taxes due or a refund of taxes paid. 2 ARL at 5.12; *see also* §§ 39-1-113, 39-10-114, C.R.S. 2020. If the petition for abatement is denied, the petitioner may appeal. *See* § 39-10-114.5(1), C.R.S. 2020; *see also* § 24-4-106(11); 2 ARL at 5.14.

### vii. Audit and Post-Audit Procedures

¶ 50 Two statutory provisions authorize an assessor to retroactively assess taxes on "omitted property": sections 39-5-125(1) and 39-10-101(2)(a)(I), C.R.S. 2020. *KM II*, ¶ 25. The question before the Colorado Supreme Court in *KM II* was whether underreporting of the value of oil and gas produced at a leasehold constitutes "omitted property" subject to corrective assessment under these two provisions. *Id.* It concluded that "the statutory scheme governing property taxation of oil and gas leaseholds and lands authorizes the retroactive assessment of property taxes when an operator underreports the volume or selling price of the oil and gas it produces." *Id.* at ¶ 34.

¶ 51 To this end, the ARL authorizes assessors to conduct reviews or audits of "taxpayer oil and gas declarations" and request additional information related to the wells owned or operated by "the taxpayer." 3 ARL at 6.52. It also authorizes counties to establish reasonable audit procedures "to fairly and accurately determine the actual value of oil and gas leaseholds and lands." 3 ARL at 6.55. And it specifies what procedures a county's audit program must include and what rights a county must provide to "all

26

taxpayers" subject to an audit. 3 ARL at 6.56; *see also* 2 ARL at 9.79-9.82.

    c.    The Injury CO2 Alleged Is to a Legally Protected Interest

¶ 52    The General Assembly has established a unique representative structure under which the unit operator is responsible for reporting and paying property taxes levied against oil and gas leaseholds and lands that are operated as a unit. But it has not expressly provided a similar representative structure for protesting and appealing a retroactive assessment or for petitioning for abatement of an increased tax liability.

¶ 53    As set forth below, notwithstanding the fact that the operator is obligated to report, collect, and remit taxes for the unit, the nonoperating fractional interest owner remains liable for and must pay its proportionate share of the taxes. And the governing statutes and ARL vest audit, protest, abatement, and appeal rights in a "taxpayer," "property owner," and "person," terms that include a nonoperating fractional interest owner who pays taxes. In the absence of clear statutory language vesting all such rights in the unit operator, we must conclude that nonoperating fractional

27

interest owners who pay taxes maintain such rights and have standing to sue to enforce them.

¶ 54    When oil and gas wells are operated as a unit, the operator alone is obligated to file an annual property tax statement for the unit.  § 39-7-101; 3 ARL at 6.21 (the property tax statement is also called a declaration schedule or an oil and gas declaration under the ARL).  Based on that annual statement, the county assessor determines the value of the oil and gas leaseholds and lands in the unit and issues a notice of valuation.  §§ 39-7-102(1)(a), -102.5; § 39-5-121(1.5).

¶ 55    Typically, the assessor is required to mail the notice of valuation to "each person who owns land." § 39-5-121(1)(a)(I).  But the parties appear to agree (so we will assume without deciding it is so) that the legislature has relieved assessors of the obligation to provide a notice of valuation to each nonoperating fractional interest owner in a unit by specifying that the assessor must

provide the notice of valuation "only to the operator, who shall accept it." § 39-5-121(1.5)(b).[9]

¶ 56     By accepting the notice of valuation, however, the operator does not acquiesce to the valuation or otherwise become liable for any tax attributable to property owned by others. *Id.* That is because, even though taxes are levied against the "total unit," each fractional interest owner in the unit is liable for its proportionate share of the taxes. § 39-10-106(1).

---

[9] The parties assert that section 39-5-121(1.5)(b), C.R.S. 2020, authorizes an assessor to issue an initial notice of real property valuation for all the oil and gas leaseholds and lands in a unit only to the unit operator. We are not so sure. That section provides, in relevant part, that "for taxable *personal* property on oil and gas leaseholds or lands" for which the operator has filed an annual statement, "the assessor shall send the notice of valuation only to the operator." *Id.* (emphasis added). Both real and personal property on oil and gas leaseholds and lands are taxed. *See* §§ 39-1-104, 39-7-102, C.R.S. 2020. And although real property assessments for oil and gas leaseholds and lands "shall follow the *schedule* for personal property . . . regarding notices of valuation," § 39-7-102.5, C.R.S. 2020 (emphasis added), we see nothing in the statutes requiring that real property assessments follow the same *procedure* as personal property assessments. Further, the ARL specifies that different notices of valuation are to be used for "reporting oil and gas production" and for reporting "[p]ersonal property used in the production of oil and gas." 2 ARL at 9.55. However, because neither party raised this concern, and because it does not affect our disposition, we assume without deciding that the parties are correct, and that the assessor is authorized to send an initial notice of real property valuation only to the unit operator.

29

¶ 57    Similarly, although the unit operator is obligated to collect taxes from the nonoperating fractional interest owners and to remit to the treasurer the full amount of the tax levied against the unit, the operator's failure to collect a proportionate share of the tax from the nonoperating fractional interest owner does not preclude the treasurer from pursuing collection remedies against that owner to collect the tax.  § 39-10-106(1), (4)(a); *see also* § 39-7-108, C.R.S. 2020.

¶ 58    Thus, although the operator alone is obligated to report, collect, and remit taxes for the unit, the nonoperating fractional interest owner is ultimately liable for and must pay its proportionate share of the taxes levied against the unit.

¶ 59    The retroactive tax liability in this case arose after an audit. The governing statutes do not provide specific audit procedures; instead, they authorize the Property Tax Administrator to prepare and publish audit guidelines that bind county assessors.  § 39-2-109(1)(k); *Huddleston*, 913 P.2d at 17.  Thus, the ARL provides the audit procedures applicable to Montezuma County's audit of the 2008 tax statement filed by Kinder Morgan.

¶ 60    Under the ARL, the assessor is required to provide a letter to

"the taxpayer" indicating that an audit of "that taxpayer's oil and

gas declaration" will soon commence.  *See* 3 ARL at 6.55.  Upon

completion of the audit, the county must mail its preliminary audit

findings to "the taxpayer at the address recorded on the annual

declaration," and give "the taxpayer" thirty days to provide

additional information.  *Id.* at 6.56.

¶ 61    Notably, the nonoperating fractional interest owners' names

and addresses must be included in the annual tax statement.  § 39-

7-101(1)(e).  So, the assessor should have access to each fractional

interest owner's address based on the annual statement to provide

that owner with the letter and preliminary audit findings required

by the ARL audit procedures.

¶ 62    If, as a result of the audit, a change in valuation is

determined, the county must issue a special notice of valuation.  3

ARL at 6.56.  In contrast to section 39-5-121(1.5)(b), the ARL does

not specify to whom the special notice of valuation must be sent.

But the ARL requires the county to provide certain rights to "all

taxpayers" subject to an audit — including the right to protest the

indicated value within thirty days — which rights could not be

exercised if the taxpayer did not receive the special notice of valuation from the county. *See* 3 ARL at 6.56.

¶ 63     The county must include with each special notice of valuation a special protest form to be completed by "the property owner" to initiate a protest of the valuation of the property. 2 ARL at 9.55. The "specific requirements" set forth in the ARL for the special protest form indicate that "[p]ursuant to §§ 39-5-121(1) and 39-5-122(2), C.R.S., every [special notice of valuation] must be sent along with a form that, if completed by the property owner, allows the property owner to explain the basis for the protest of the property's valuation or classification." 2 ARL at 9.70.

¶ 64     Indeed, the ARL plainly states: "The Division recommends that assessors require letters of agency from persons who are not the owner of record but are filing a protest on behalf of the property owner. The owner is the only person recognized by law to have 'standing' to file a protest." 2 ARL at 5.2. And the Property Tax Administrator's "interpretations of the taxation statutes as embodied in the ARL are entitled to judicial deference." *Manor Vail Condo. Ass'n v. Bd. of Equalization*, 956 P.2d 654, 659 (Colo. App. 1998).

¶ 65     Under section 39-5-122(2), to which the special protest form refers, any "person" who believes their property "has been valued too high" has the right to object and protest an assessment. "Person" means "natural persons, corporations, partnerships, limited liability companies, associations, and other legal entities which are or may become taxpayers by reason of the ownership of taxable real or personal property." § 39-1-102(9); *see also* 2 ARL at 5.1 ("If a taxpayer disagrees with the value assigned by the assessor, the taxpayer may file a protest during the statutory protest period.").

¶ 66     If a taxpayer files a protest, the county must issue a special notice of determination, which must include a written explanation "regarding the basis for the omitted property and the county's decision" and an advisement of the taxpayer's right to file an abatement petition.  3 ARL at 6.56.  Again citing section 39-5-122(2), the ARL requires that the special notice of determination be mailed to "each property owner who filed a protest with the [a]ssessor."  2 ARL at 9.79.

¶ 67     The special notice of determination itself advises the recipient of the right to "continue your appeal" by filing a petition for

33

abatement with the county. 2 ARL at 9.82. It then refers to sections 39-1-113 and 39-10-114 and advises the recipient of the right to appeal any unsatisfactory decision of the board of county commissioners to the board of assessment appeals. *Id.* Under the statutes and the ARL, the "taxpayer" is the one vested with the right to file a petition for abatement. *See* § 39-1-113; 2 ARL at 5.13-5.14. Again, the ARL confirms: "As with taxpayers filing protests, a taxpayer must have proper standing to file an abatement petition. The first criterion is ownership." 2 ARL at 5.15.

¶ 68    "Taxpayer" is not defined in the ARL, but its plain meaning and dictionary definition is "[s]omeone who pays or is subject to a tax." Black's Law Dictionary (11th ed. 2019); *accord* Merriam-Webster Dictionary, https://perma.cc/D429-STMG (defining "taxpayer" as "one that pays or is liable for a tax"); *see also People v. Allman*, 2019 CO 78, ¶ 15 ("Because the statute does not specifically define the word . . . , we look to the plain and ordinary meaning of the word, aided by the dictionary definition.").

¶ 69    Thus, based on the plain language of the statutes and the ARL — which we are required to interpret together, to give consistent, harmonious, and sensible effect to all the provisions, *see Cendant*

*Corp.*, 226 P.3d at 1106 — we conclude that each nonoperating fractional interest owner who pays taxes is a "property owner," a "person," and a "taxpayer" entitled to the panoply of rights afforded such "property owner," "person," or "taxpayer" under the review, audit, protest, abatement, and appeal procedures detailed in the ARL and related statutes. *See* 3 ARL at 6.52-6.56.

¶ 70 Nothing in the statutes or the ARL indicates that a unit operator is the only "property owner" to whom a special notice of valuation and special protest form need be sent, *see* 2 ARL at 9.55, 9.70, 9.79, or who has standing to file a protest, *see* 2 ARL at 5.2. Nothing in the statutes or the ARL indicates that a unit operator is the only "person" who may protest the valuation of the leaseholds and lands in an oil and gas unit as reflected in a notice of valuation or special notice of valuation. *See* § 39-5-122(2). Nothing in the statutes or the ARL indicates that a unit operator is the only "taxpayer" who is entitled to be notified of an audit, receive preliminary audit findings from the assessor, or protest the assessment, *see* 3 ARL at 6.56, or who has standing to file a petition for abatement of taxes levied against the unit, *see* § 39-1-113; 2 ARL at 5.13-5.15. Nothing in the statutes or ARL vests these

35

rights exclusively in the unit operator or appoints the unit operator as the statutory agent or representative of all nonoperating fractional interest owners when oil and gas wells are operated as a unit. And nothing in the ARL audit guidelines mandates a different procedure when the property is retroactively assessed or when taxes are increased retroactively.

¶ 71　We acknowledge that our holding today may upset settled practices regarding how counties review, audit, and retroactively assess the value of oil and gas leaseholds and lands and how they handle protests and petitions for abatement resulting from such retroactive assessments. It may also contravene the expectations of many nonoperating fractional interest owners, who may presume that the unit operator will handle such matters on their behalf. To be sure, this may be a case of "be careful what you wish for" because if an individual nonoperating fractional interest owner is *entitled* to receive notice of and challenge the retroactive assessment of its property, then it is equally *obligated* to raise such a challenge on its own behalf or designate an agent to protest for it. *See* 2 ARL at 5.2.

¶ 72    But our primary objective when interpreting the governing statutes and the ARL is to effectuate the General Assembly's intent "by looking to the plain meaning of the language used, considered within the context of the statute as a whole." *Hogan v. Bd. of Cnty. Comm'rs*, 2018 COA 86, ¶ 11 (citation omitted), *aff'd sub nom. Mook v. Bd. of Cnty. Comm'rs*, 2020 CO 12.  We cannot insert words into a statute.  *See id.* at ¶ 23 (declining to "judicially rewrite" statutes to support government's interpretation of term in ARL) (citation omitted).  Absent clear language authorizing the unit operator to represent all tax-paying nonoperating fractional interest owners in the review, audit, protest, and abatement procedures, each such taxpayer has standing to assert that its rights in such procedures have been violated.

¶ 73    CO2 alleged that its members have suffered an injury in fact — the deprivation of due process and an economic loss — to a legally cognizable interest as contemplated by statutory and constitutional provisions.  Thus, we conclude that CO2's members have standing to bring the claims asserted in the complaint against Montezuma County.

¶ 74 This conclusion, however, does not end the inquiry because CO2 must also have organizational standing to bring the asserted claims on behalf of its members. *Jones*, ¶ 29. We have already concluded that CO2's members would have standing to sue in their own right. But for CO2 to have organizational standing, the interests it seeks to protect must be germane to the organization's purpose and the claims asserted and the relief requested must not require participation by individual members in the lawsuit. *Id.*

¶ 75 Because the district court determined that CO2's members lacked standing in their own right, it did not determine whether CO2 met the remaining criteria to have organizational standing. Neither party has argued that we should determine this question for the first time on appeal. Accordingly, the district court must address this issue on remand.

¶ 76 In reaching our conclusion today, we express no opinion as to the merits of CO2's arguments. The district court disposed of this case on standing. Standing is a threshold issue separate from resolution of the merits. *Barber*, 196 P.3d at 245. We have concluded that CO2's members have standing. Thus, we remand to the district court for further proceedings.

### III. Real Party in Interest

¶ 77     CO2 contends on appeal that the district court erred by concluding it was not "the real party in interest" with standing to maintain the action. But the court's order in this regard appears to contradict itself. The court first concluded that CO2 *was* the real party in interest under C.R.C.P. 17(a), finding that CO2 was "a party with whom or in whose name a contract has been made for the benefit of another." But then, as part of its standing analysis, the court found that CO2 "is not a real party in interest and lacks standing to maintain this lawsuit."

¶ 78     Colorado Rule of Civil Procedure 17(a) provides that "[e]very action shall be prosecuted in the name of the real party in interest." The purpose of the rule is "to protect defendants from the harassment of lawsuits by persons who do not have the power or right to make final and binding decisions concerning prosecution, compromise, and settlement." *Williams v. Genesee Dev. Co. No. 2*, 759 P.2d 823, 825 (Colo. App. 1988). "The real party in interest is that party who, by virtue of substantive law, has the right to invoke the aid of the court in order to vindicate the legal interest in question." *Goodwin v. Dist. Ct.*, 779 P.2d 837, 843 (Colo. 1989).

39

¶ 79     The concepts of "real party in interest" and "standing" are often confused.  5A Stephen A. Hess, *Colorado Practice Series: Handbook On Civil Litigation* § 4:2, Westlaw (2020 ed. database updated Oct. 2020).  "The distinctions between these categories are not always clear, and sometimes the inquiries overlap." *Id.*  Our courts have, on occasion, analyzed standing and real party in interest together.  *See, e.g.*, *Miller v. Accelerated Bureau of Collections, Inc.*, 932 P.2d 824, 825 (Colo. App. 1996); *Summers v. Perkins*, 81 P.3d 1141, 1142 (Colo. App. 2003).

¶ 80     Standing "is the broadest and most substantive idea, which insures that plaintiffs assert only those claims demonstrating a legally cognizable injury so that the jurisdiction of the courts is exercised only when an actual controversy exists."  *Hess*, § 4.2.  When the real party in interest is in issue, however, "there is usually no question about whether a legally cognizable claim has been stated.  Instead, the question is to determine who possesses the right to assert the claim . . . ." *Id.*  Thus, even if a plaintiff has standing to bring a claim, they may not be the real party in interest if, for example, they have assigned that claim to a third party. *See*

*Platte Valley Mortg. Corp. v. Bickett*, 916 P.2d 631, 633 (Colo. App. 1996) ("An assignee of a claim is a real party in interest.").

¶ 81 We have already concluded, as part of our standing analysis, that CO2's members have the right to invoke the aid of the court to vindicate their rights under the constitution, statutes, and ARL guidelines. CO2's members are real parties in interest. But CO2's members are not the plaintiffs; CO2 is the plaintiff.

¶ 82 Rule 17(a) provides that "a party with whom or in whose name a contract has been made for the benefit of another . . . may sue in his own name without joining with him the party for whose benefit the action is brought." The district court found that CO2 was such a party. Neither party appeals that finding and we see no reason to disturb it.[10]

## IV. Attorney Fees

¶ 83 CO2 contends that it is entitled to attorney fees pursuant to C.A.R. 38(b) and 39.1 because Montezuma County's defense of the district court's order was frivolous and groundless under section

---

[10] Because of our disposition, we need not address CO2's remaining contention that the district court erred by denying its post-dismissal motion to amend its complaint.

41

13-17-102(4), C.R.S. 2020.  CO2 does not appeal the district court's ruling that the parties are to bear their own attorney fees and costs incurred at the trial court level.  Instead, it seeks attorney fees for Montezuma County's defense of the district court orders on appeal.  We conclude that CO2 is not entitled to appellate attorney fees.

¶ 84     A court must award attorney fees against a party who "brought or defended a civil action, either in whole or in part, that the court determines lacked substantial justification."  § 13-17-102(2); *see also* § 13-17-102(4).  An action lacks substantial justification if it is "substantially frivolous, substantially groundless, or substantially vexatious."  § 13-17-102(4); *see also* *Castillo v. Koppes-Conway*, 148 P.3d 289, 292 (Colo. App. 2006).

¶ 85     An appeal should be considered frivolous only "if the proponent can present no rational argument based on the evidence or law in support of a proponent's claim or defense, or the appeal is prosecuted for the sole purpose of harassment or delay."  *Mission Denver Co. v. Pierson*, 674 P.2d 363, 366 (Colo. 1984).  And we should award attorney fees on appeal as a sanction under C.A.R. 38(b) only in "clear and unequivocal cases" of "egregious conduct."  *Wood Bros. Homes, Inc. v. Howard*, 862 P.2d 925, 935 (Colo. 1993).

42

¶ 86 We do not find that Montezuma County's defense of the district court's order lacks substantial justification. Even though it was ultimately unsuccessful, Montezuma County presented rational arguments based on the evidence and the law — a particularly complicated scaffold of statutes and guidelines — in support of its claims. *See Mission Denver Co.*, 674 P.2d at 366 (finding that appeal was not frivolous "merely because [it was] ultimately unsuccessful). Therefore, we decline to award CO2 its appellate attorney fees.

## V. Conclusion

¶ 87 We reverse the district court's order dismissing the complaint for lack of standing and remand for further proceedings consistent with this opinion.

JUDGE ROMÁN and JUDGE WELLING concur.

43