Robert BROTMAN, State Board of Land Commissioners, and State of Colorado, Petitioners/Cross–Respondents,

v.

EAST LAKE CREEK RANCH, L.L.P., a Colorado limited liability Partnership, Respondent/Cross–Petitioner.

No. 99SC713.

Supreme Court of Colorado, En Banc.

Sept. 10, 2001.

Duncan, Ostrander & Dingess, P.C., Donald M. Ostrander, James Birch, Denver, CO, Attorneys for Petitioner/Cross–Respondent Robert Brotman.

Ken Salazar, Attorney General, D. Edgar Hamrick, Assistant Attorney General, Natural Resources and Environment Section, Denver, CO, Attorneys for Petitioners/Cross–Respondents State Board of Land Commissioners and State of Colorado.

Dunn & Abpalnalp, P.C., John W. Dunn, Vail, CO, Fairfield and Woods, P.C., Robert S. Slosky, Gregory C. Smith, Denver, CO, Attorneys for Respondent/Cross–Petitioner East Lake Creek Ranch L.L.P., a Colorado limited liability partnership.

Justice BENDER delivered the Opinion of the Court.

In this appeal, we hold that because the Colorado Enabling Act imposes a trust on the state of Colorado to manage the school lands given to Colorado for the benefit of Colorado's public schools, and not for the benefit of taxpayers at large, the East Lake Creek Ranch does not have standing to enjoin a Land Board transaction as a trust beneficiary, as a taxpayer, or as an adjacent land owner.

The Ranch sued to enjoin the operation of an agreement between the Petitioners State Board of Land Commissioners (Land Board or Board) and Robert Brotman in which Brotman would gain title to school land managed by the Land Board. The trial court found that the Ranch had derivative taxpayer standing and granted a preliminary injunction. The court of appeals determined that the Ranch had direct taxpayer standing and standing as a trust beneficiary and affirmed. We reverse.

## I. FACTS AND PROCEEDINGS BELOW

To provide background for our discussion of this case, we review the history of state enabling acts generally and the Colorado Enabling Act in particular.

In *Andrus v. Utah,* 446 U.S. 500, 520–24, 100 S.Ct. 1803, 64 L.Ed.2d 458 (1980) (Powell, J. dissenting), Justice Powell summarized the history of congressional grants in state enabling acts of land for school use. Each of the 13 States forming the Union had sovereign authority over the lands within its borders. This land provided those states with a tax base for the support of education and other governmental functions. *Id.* at 522, 100 S.Ct. 1803. On the other hand, in 1802, settlers in what is now Ohio, sought statehood within a portion of the Northwest Territory and encountered a different situation: large portions of the proposed state belonged to the federal government. *Id.* Thus, unless the federal government waived its immunity from taxation, the new state would not have an adequate tax base. In order to place Ohio on an equal footing with the original states, Congress enacted a compromise that "set a pattern followed in the admission of virtually every other state." *Id.* "As consideration for each new State's pledge not to tax federal lands, Congress granted the State a fixed proportion of the lands within its borders for the support of public education." *Id.* at 523, 100 S.Ct. 1803. To ensure that each new state would receive a random cross-section of public land, the federal government granted certain numbered "sections" of land within each "township." [1] *Id.*

In Colorado's case, Congress provided in the 1875 Colorado Enabling Act [2] that, should the inhabitants of the Territory of Colorado pass a state constitution and form a state, the federal government would grant, among other things, two sections in each

---

1. "A 'township' [is] a 36–square mile division of land—six miles by six miles—that was the basic format for land surveying throughout the West. A 'section' [is] a single square in that 36–square survey." *Branson Sch. Dist. v. Romer,* 161 F.3d 619, 625 n. 2 (10th Cir.1998).

2. The Tenth Circuit notes in *Branson* that this was Congress' second enabling act for Colorado

after the first effort in 1864 "failed to gain sufficient voter support during the Civil War and then the resurrection of the effort became embroiled in the Reconstruction cross-fire between President Andrew Johnson and the Republican-controlled Congress of the late 1860s." *Branson Sch. Dist.,* 161 F.3d at 625 n. 1 (10th Cir.1998).

township to the new state "for the support of the common schools." 18 Stat. 474 (1875); Enabling Act § 7, 1 C.R.S. (2000) at 27. The Enabling Act allowed the state to sell these lands, but only at a public sale and for no less than $2.50 per acre, and mandated that the proceeds from such sales be put in a permanent school fund, the interest from which the state must spend in support of the common schools. Enabling Act § 14, 1 C.R.S. at 28.

In 1876, Colorado's leaders convened a constitutional convention and approved our constitution. The Colorado constitution established a State Board of Land Commissioners to manage the lands granted to the new state in the Enabling Act. Colo. Const. art. IX, §§ 9, 10.

The Land Board currently manages approximately three million surface acres and four million mineral acres in the state, direct income from which generated more than $22 million for schools in fiscal year 1999–2000. *Colorado Land Board 2000 Annual Report, available at* http://trustlands.state.co.us/2000ÄnnualÄeport/colorado_land_board_2000_annual_.htm. In addition, interest from the permanent school fund generated approximately $20 million.[3] *Id. Our constitution requires that the income generated from the Land Board's management of school lands and the permanent school fund be distinct from and in addition to revenue appropriated for public education. See* Colo. Const. art IX, § 3. Thus, the $42 million generated by the school lands in fiscal year 1999–2000 is distinct from and in addition to the *approximately $5 billion in revenue appropriated for public education that same year.*[4]

The property at issue in this case (the parcel) is one of the one square mile (640 acre) sections in one of the 36–section townships,[5] given by the federal government to the state of Colorado through the 1875 Enabling Act for the support of the common schools. Respondent/Cross–Petitioner East Lake Creek Ranch (Ranch) owns an interest in property that partially adjoins the western boundary of the parcel. The parcel is bounded on the other sides by federal forest lands and by the Arrowhead ski area. Surrounded on all sides by land owned by others and lacking access to the state's general road system, the parcel is "landlocked." From 1974 to 1994, the Land Board leased the parcel for grazing purposes to the Ranch, through its principals, for an average annual rental of $0.65 per acre (approximately $416 per year for the entire parcel). The Land Board did not renew the lease in 1994 but instead sought a more productive use of the property.

In 1996, the Land Board entered into an "Agreement to Exchange Real Property" (agreement) with Petitioner/Cross–Respondent Robert Brotman (Brotman). The agreement essentially provided that the Land Board would deposit a patent conveying the parcel, and Brotman would deposit $1.84 million into an escrow account and the escrow agent would use the escrow funds deposited by Brotman to purchase "replacement" properties as directed by the Land Board.

After Brotman and the Board had signed the agreement but before the transaction was completed, the Ranch sued to prevent the agreement's operation. The Ranch alleged, among other things, that the transaction was not an "exchange" but rather a "sale" and as such violated constitutionally mandated sale procedures. *See* Colo. Const. art. IX, § 9 (providing land board has the duty to provide for the sale or other disposition of school lands "under such regulations as may be prescribed by law"); § 36–1–124, 15 C.R.S.

---

**3.** The Land Board also manages seven other, smaller trusts that benefit the University of Colorado, Colorado State University, State Parks, Fort Lewis College, the Department of Corrections and Public Buildings. Total revenues from these other trusts in fiscal year 1999–2000 was approximately $750,000. Colorado State Land Board, Answers to Frequently Asked Questions, available at http://trustlands. state.co.us/ general_faq.html.

**4.** This revenue comes from a variety of state, local, and federal sources. *See Colorado General Assembly Legislative Council, Where do Public Schools in Colorado Get Revenue and How do the Spend it?* (1998), available at http:// www.state.co.us/ gov_dir/leg_dir/lcsstaff /schfin/ 98school-pamphlet. htm.

**5.** Specifically, the parcel is section 16, Township 5 South, Range 82 West, 6th P.M., in Eagle County.

(1990) (setting forth procedures for school land sales).

Brotman and the Board filed motions to dismiss on the issue of standing. The trial court denied these motions. The trial court rejected the Ranch's argument that it had individual standing as an adjacent landowner because if the transaction were completed, Brotman would have the right to "un-lock" the landlocked parcel by condemning a right-of-way through the Ranch's property. *See* Colo. Const. art II, § 14; § 38–1–102(3), 10 C.R.S. (2000). Since the Ranch's land was only one of several adjacent properties through which Brotman could condemn a right of way and because he had not yet done so, the trial court reasoned that "any injury to the [Ranch] as a result of the Agreement is fluctuating and uncertain at best," and thus the Ranch had not established that there was an "existing legal controversy that can be effectively resolved and not a mere possibility of a future legal dispute."

Although the trial court rejected the Ranch's argument that it had individual standing as an adjacent land owner, the trial court concluded that the Ranch nonetheless had derivative standing as a taxpayer under *McCroskey v. Gustafson,* 638 P.2d 51 (Colo. 1981) to bring suit on behalf of the Land Board. In *McCroskey,* we adopted a test established by the court of appeals for deciding standing in a suit brought by a citizen-taxpayer on behalf of a municipality. *Id.* at 56. The trial court concluded that the Ranch met the requirements of that test and therefore allowed the Ranch to proceed in the case.

After hearing the Ranch's motion for preliminary injunction, the trial court concluded that the transaction between Brotman and the Land Board was not an exchange but rather the "functional equivalent of a sale" and as such violated the mandated procedures for selling school lands. The trial court therefore enjoined Brotman and the Board from completing the transaction.

Brotman and the Board appealed, contending, among other things, that the trial court erred in holding that the Ranch had derivative taxpayer standing under *McCroskey.* The Ranch cross-appealed, asserting that it did have such standing and that, further-

more, it was error for the trial court to conclude that it did not also have individual standing as an adjacent landowner. The court of appeals declined to extend derivative taxpayer standing under *McCroskey* to the facts of this case. *East Lake Creek Ranch v. Brotman,* 998 P.2d 46, 48 (Colo.App.1999). Instead, the court of appeals held that the Ranch had direct taxpayer standing under *Dodge v. Department of Social Services,* 198 Colo. 379, 600 P.2d 70 (1979). *East Lake Creek Ranch,* 998 P.2d at 49.

The question in *Dodge* was "[u]nder what circumstances, if any, does the taxpayer/citizen have standing to challenge an allegedly unlawful expenditure of public funds?" *Dodge,* 198 Colo. at 381, 600 P.2d at 71. In answering this question, we affirmed the standing rule in *Wimberly v. Ettenberg,* 194 Colo. 163, 570 P.2d 535 (1977). In that case, we held that "[t]he proper inquiry on standing is whether the plaintiff has suffered injury in fact to a legally protected interest as contemplated by statutory or constitutional provisions." *Id.* at 168, 570 P.2d at 539. We held in *Dodge* that, in the context of a taxpayer challenge to the unlawful expenditure of funds, the "injury-in-fact" prong of the *Wimberly* test may be found in the absence of direct economic injury and that the plaintiff taxpayers sufficiently alleged an injury-in-fact by claiming that the expenditure of state funds for nontherapeutic abortions violated Colorado Constitution article V., section 33. *Dodge,* 198 Colo. at 383, 600 P.2d at 72.

The court of appeals in the present case reasoned that *Dodge* was a better basis on which to establish standing than *McCroskey* because *McCroskey* involved a taxpayer action on behalf of a municipality, while *Dodge,* like the present case, involved an action against a state agency. *East Lake Creek Ranch,* 998 P.2d at 48. The court of appeals held that the Ranch's allegations that the Land Board acted outside of its constitutional authority by entering into the transaction with Brotman was "sufficient under *Dodge* to confer taxpayer standing." *Id.* at 49.

The court of appeals went on to explain that principles of trust law relied on by the Land Board did not negate the Ranch's standing as a taxpayer. The Board had argued that the trial court's finding of derivative taxpayer standing under *McCroskey* cre-

ated a practical problem under principles of trust law: If the Enabling Act is viewed as having created a trust with the state, through the Land Board as trustee and the common schools as the beneficiaries of the trust, and if taxpayers such as the Ranch were able to bring derivative suits on behalf of the Land Board, then the Board would not be able to serve the interests of the common schools when the schools' interests were adverse to those of suing taxpayers. The court of appeals disagreed, reasoning that that there was no conflict between the duties the Land Board owed the schools and the duties the Board owed the taxpaying public because the two groups were one and the same: "the members of the public at large, through the institution of the public schools, are the intended beneficiaries of the trust." *Id.*

Because the court of appeals found that the Ranch had standing on grounds other than as an adjacent property owner, it did not address the Ranch's argument on cross-appeal that it had standing on that basis. Turning to the merits of the case, the court of appeals affirmed the trial court's finding that the agreement constituted a sale rather than an exchange and affirmed the injunction.

Brotman and the Board petitioned this court for certiorari and the Ranch cross-petitioned. We granted certiorari to determine if the Ranch has standing as an adjacent property owner, as a taxpayer under *Dodge,* or as a beneficiary of the school lands trust, and to determine if the agreement was a sale or an exchange.[6] Because we find that the Ranch does not have standing under any of the above grounds, we do not reach the sale versus exchange issue. We reverse the

court of appeals and return this case to that court with directions to return it to the trial court to dissolve the injunction and dismiss the complaint.

## II. ANALYSIS

There are three standing issues before us on appeal—whether the Ranch has standing as (1) an adjacent property owner, (2) as a taxpayer under *Dodge,* or (3) as beneficiary of the school lands trust. We will address each question in turn.

### A. Standing under *Wimberly* as an Adjacent Land Owner

In *Wimberly,* we announced a two-step test for determining standing. A plaintiff has standing if he or she (1) incurred an injury-in-fact (2) to a legally protected interest, as contemplated by statutory or constitutional provisions. *Wimberly,* 194 Colo. at 168, 570 P.2d at 539. The plaintiffs in *Wimberly* failed to meet either of these two criteria because (1) their alleged injury was too indirect and incidental to constitute an injury-in-fact, and (2) they did not establish that their alleged injury was to a legal right protected by statutory or constitutional provisions. *Id.* Because we have applied the *Wimberly* test in a variety of contexts, it has become our "general" test for standing. *See Maurer v. Young Life,* 779 P.2d 1317, 1324 n. 11 (Colo.1989).

The Ranch alleges that it will suffer an injury-in-fact if the transaction is allowed to be completed because once Brotman owns the parcel, he will have the right to condemn a way of necessity across the Ranch's property pursuant to Colorado Constitution article

---

**6.** The precise issues on which we granted certiorari are as follows:

1. Whether the court of appeals erred in holding that East Lake Creek Ranch, L.L.P. (ELCR) is a beneficiary of the school lands trust solely because it is a member of the public, in contradiction to the language in Colorado's Enabling Act?

2. Whether the court of appeals erred in holding that ELCR has taxpayer standing to sue the State Board of Land Commissioners when ELCR did not allege the unlawful expenditure of state funds or allege the necessary nexus

between its status as a taxpayer and the exchange agreement?

3. Whether the court of appeals should have determined that ELCR possessed standing as an adjacent property owner?

4. Whether the court of appeals erred by characterizing the Exchange Agreement between the Board and Robert Brotman as a "sale" rather than an "exchange" either (1) because the Board and Brotman placed a monetary value on the exchanged property; or (2) because the Agreement did not have a date by which the Board had to obtain replacement property?

II, section 14.[7] The Land Board responds [8] that this possibility cannot constitute an injury-in-fact because it is, in the language of *Wimberly*, "indirect and incidental" to the agreement and thus "insufficient to confer standing." 194 Colo. at 168, 570 P.2d at 539.

We agree with the Board. The Ranch does not seek to enjoin an attempt by Brotman to seek a way of necessity through the Ranch's property; Brotman has made no such attempt. Instead, the Ranch seeks to enjoin an agreement in which Brotman would merely acquire title to the parcel on the theory that, once Brotman acquires title he would have the right to seek a way of necessity across an adjoining property owner's land. Even if we were to assume that, upon acquiring title, Brotman would immediately seek a way of necessity and would specifically seek a way across the Ranch's land rather than across the land of one of the other adjacent land owners, the Ranch would still not have standing here because condemnation would not be a result of the allegedly unlawful agreement, but rather would be the result of a landowner exercising his valid, constitutional rights under Colo. Const. art. II, § 14. In such a case, the Ranch would not have standing in equity to enjoin the condemnation, but instead would be entitled to just compensation. *Dep't of Highways v. Denver and Rio Grande Western R.R. Co.*, 789 P.2d 1088, 1092 (Colo.1990)("[J]ust compensation must be paid to condemn a private way of necessity...."); *Town of Glendale v. City & County of Denver*, 137 Colo. 188, 193, 322 P.2d 1053, 1056 (1958) ("[E]quity will not lie to enjoin proceedings for condemnation, for the reason that the mere taking of such proceedings does no injury to property, and for the further reason that the grounds relied upon for an injunction may be urged in defense of the proceedings."); *accord Nichols on Eminent Domain*, Vol. 6A § 28.02[5][a] at 28-34 (3d ed.2001).

Thus, even if Brotman does later decide to condemn a way of necessity across the Ranch's land, while the injury caused by that condemnation would be a legally protected injury, it would not be an injury contemplat- ed by the law of equity but instead would be an injury contemplated by the statutory provisions governing condemnation proceedings and the constitutional requirements of due process and just compensation. §§ 38-1-101 to 122, 10 C.R.S. (2000) (governing condemnation proceedings); U.S. Const. amends. V, XIV; Colo. Const. art. II, §§ 15, 25. While the Ranch may raise defenses to a condemnation action or seek just compensation in that action, the Ranch does not today have standing to enjoin the agreement between the Land Board and Brotman on the theory that once the agreement is final, Brotman might seek to condemn a way of necessity across the Ranch's land.

Hence, we hold that the Ranch lacks standing under *Wimberly* as an adjacent land owner. We therefore turn to the question of whether the Ranch nonetheless has taxpayer standing under *Dodge*.

### B. Taxpayer Standing under *Dodge*

The Land Board notes that the question we addressed in *Dodge* was narrow: "The only issue to be addressed on this appeal is: Under what circumstances, if any, does the taxpayer/citizen have standing to challenge an allegedly unlawful expenditure of public funds?" *Dodge*, 198 Colo. at 381, 600 P.2d at 71. The Board therefore argues that, because the Ranch has not alleged that the Land Board unlawfully spent any taxpayer funds in connection with the exchange agreement, it was error for the court of appeals to conclude that the Ranch had standing under *Dodge*. The Ranch counters that although *Dodge* did involve the expenditure of public funds, the reasoning of that case embraces the situation in which, while no funds are expended, the allegedly unlawful government action might cause a shortfall in funds, thereby requiring that the state exercise the taxing power to raise additional funds. The Board responds that, even if it were proper to extend the reasoning of *Dodge* to such a scenario, that scenario is not presented in this case.

---

7. This argument presumes that the Land Board in its proprietary role does not itself have the authority to acquire a way of necessity pursuant to Colorado Constitution article II, section 14. That question is not before us.

8. We note that we attribute the petitioners' arguments involving standing to the Land Board because the Land Board in its briefs focused on standing while Brotman focused on the sales versus exchange issue.

■ We agree with the Board. As noted, income generated from the Land Board's management of school lands is distinct from and in addition to income generated through taxation for schools. Our constitution forbids altering the amount of money appropriated for education based on the income generated from the Land Board's management of the school lands. Colo. Const. art IX, § 3. Thus, because the Land Board's management—or mismanagement—of school lands has no effect on the state's funding of schools through the taxing power, management decisions of the Land Board have no effect on the Ranch as a taxpayer. We therefore hold that it was error for the court of appeals to conclude that the Ranch had standing as a taxpayer under *Dodge.*

We note that this conclusion is consistent with the holding of the Federal District Court in *Branson School District v. Romer,* 958 F.Supp. 1501, 1511 (D.Colo.1997), *aff'd on other grounds,* 161 F.3d 619 (10th Cir. 1998). The court in that case held that the possibility that implementation of an amendment to the Colorado Constitution would cause the Land Board's management of school lands to generate less money than before was a cognizable injury sufficient to give standing to the school district and student plaintiffs. *Id.* Because money generated by the Land Board is in addition to funds generated by taxes and does not affect the amount of tax revenue spent on schools, management decisions of the Land Board do not affect taxpayers. They might, however, affect schools and school children who receive this extra funding in addition to that appropriated by state and local taxes. Thus, our decision today that the Ranch does not have taxpayer standing does not preclude a determination like that in *Branson* that plaintiff schools and schoolchildren might have such standing.

Having found that the Ranch lacks standing under both *Wimberly* and *Dodge,* we turn to the final standing question before us: whether the Ranch has standing as a beneficiary of the school lands trust.

## C. Standing as a Trust Beneficiary

The court of appeals agreed with the Tenth's Circuit's holding in *Branson* that the Colorado Enabling Act creates an enforceable trust, with the state of Colorado as trustee, for the benefit of the state's common schools. *East Lake Creek Ranch,* 998 P.2d at 49. The court of appeals did not, however, agree with the Tenth Circuit's conclusion that the common schools are "the sole and exclusive beneficiary of the school lands trust." *Branson Sch. Dist.,* 161 F.3d at 637. Instead, the court of appeals held that "the members of the public at large, through the institution of the public schools, are the intended beneficiaries of the trust." *East Lake Creek Ranch,* 998 P.2d at 49. Because the Ranch is a member of the public at large, the court of appeals concluded that it was an intended beneficiary of the trust and had standing on that basis. *Id.* We disagree.

■ We begin our analysis by reviewing the *Branson* case in which the Tenth Circuit affirmed the District Court's determination that the Colorado Enabling Act created a federal trust over the school lands with the state of Colorado as trustee and the public schools as beneficiaries. 161 F.3d 619, 634, *aff'g* 958 F.Supp. 1501, 1516. Finding the reasoning in *Branson* persuasive, we hold that the Colorado Enabling Act does create a trust, the beneficiaries of which are not the public at large as the court of appeals held, but rather are the public schools. Because the Ranch is not a beneficiary of the trust, we conclude that it does not have standing as a beneficiary to enforce the terms of the trust.

In *Branson,* several school districts and schoolchildren sued in Federal District Court to enjoin the enforcement and implementation of Amendment 16 to Article IX of the Colorado Constitution (Amendment 16). That Amendment changed the structure of the Land Board and its responsibilities.[9] *See* Amendment 16, 1997 Colo. Sess. Laws 2399. The plaintiffs alleged that some of these changes conflicted with the Colorado Enabling Act, thereby violating the Supremacy Clause of the United States Constitution.

9. We note that Amendment 16 was not in effect when the present dispute arose.

U.S. Const. art. VI, cl. 2. The Tenth Circuit affirmed the Federal District Court's conclusion that the plaintiffs had standing to bring suit and had asserted a cause of action but that the Amendment was constitutional. *Branson Sch. Dist.,* 161 F.3d at 643, *aff'g* 958 F.Supp. 1501.

In order to determine whether the plaintiffs had standing, the *Branson* court had to determine whether the Enabling Act created a federal trust. The court noted that the question of whether a particular state enabling act creates a federal trust is a case-by-case inquiry:

> [T]he question of whether a statehood statute creates a federal trust requires a case-specific analysis of the particular state's enabling statute because the history of each state's admission to the Union is unique and Congress seems to have experienced an evolution in its legislative approach to school land grants.

*Id.* at 633. For instance, the Supreme Court construed the land grants made to Alabama (in 1819) and Michigan (in 1847) as honorary obligations in the nature of "solemn agreements," rather than as trusts. *Id. See Cooper v. Roberts,* 59 U.S. (18 How.) 173, 181–82, 15 L.Ed. 338 (1855) (Michigan); *Alabama v. Schmidt,* 232 U.S. 168, 173–74, 34 S.Ct. 301, 58 L.Ed. 555 (1914) (Alabama). These land grants are notable for their sparse language: the Alabama enabling act conveyed one section of every township in the new state "to the inhabitants of such township for the use of schools," and the Michigan act conveyed one section in every township "to the State for the use of schools." *Branson Sch. Dist.,* 161 F.3d at 634 n. 11; *See Schmidt,* 232 U.S. at 172, 34 S.Ct. 301, *Cooper,* 59 U.S. at 179.

In contrast, the Supreme Court interpreted the "later, more specific land grants to New Mexico and Arizona as creating fiduciary obligations on the part of the states to manage the lands for the exclusive benefit of the common schools." *Branson Sch. Dist.,* 161 F.3d at 633. *See Lassen v. Arizona,* 385 U.S. 458, 460–61, 87 S.Ct. 584, 17 L.Ed.2d 515 (1967); *Ervien v. United States,* 251 U.S. 41, 48, 40 S.Ct. 75, 64 L.Ed. 128 (1919). The Supreme Court held that the school lands in these cases were granted to the states to be held in trust. *Branson Sch. Dist.,* 161 F.3d 619.

After reviewing these two types of acts, the *Branson* court noted that "Colorado's admission to the Union under the 1875 enabling act falls somewhere in between—in both chronology and specificity—the Michigan/Alabama and New Mexico/Arizona experiences." *Branson Sch. Dist.,* 161 F.3d at 633.

Before analyzing the Colorado Enabling Act, the *Branson* court reviewed basic principles of trust law. *Id.* The court noted that "[a] trust is created when a settlor conveys property to a trustee with a manifest intent to impose a fiduciary duty on that person requiring that the property be used for a specific benefit of others." *Id.* at 633. The court also noted that "Congress need not use any particular form of words in expressing its intent to create a trust, and the absence of the words 'trust' or 'trustee' in the conveyance is not determinative of the question of whether Congress intended to create a trust relationship." *Id.* at 634.

Applying these principles, the *Branson* court noted first that the language in section 7 of the Enabling act that the school lands "are hereby granted to the said State for the support of common schools" was, standing alone, insufficient to create a trust because it was no more specific than the language of the Michigan and Alabama grants. *Id.* Nonetheless, the court held that the language in section 7, when supplemented by language in section 14 of the act, was sufficient to create a trust. *Id.* at 634. Section 14 provides that the school lands "shall be disposed of only at public sale and at a price not less than two dollars and fifty cents per acre, the proceeds to constitute a permanent school fund, the interest of which to be expended in the support of common schools." Colorado Enabling Act, § 14. The Tenth Circuit held that by enumerating Colorado's specific duties with regard to the school lands in section 14, that is, by prescribing (1) how Colorado may dispose of the lands, (2) at what price, (3) how the state must hold the income from the sale of school lands, (4) what the state must do with the interest, and (5) by providing for the permanence of the benefit of these assets for the common schools, Congress demonstrated its intent "to create a fiduciary obligation for the state of Colora-

do to manage the school lands in trust for the benefit of the state's common schools." *Branson Sch. Dist.*, 161 F.3d at 634.

■ The court noted that its conclusion that the Enabling Act created a trust was "buttressed by the immediate response to Congress' enabling statute by the Framers of the 1876 Colorado Constitution." *Id.* Absent indications to the contrary, a conveyance using the words "for the use of" or "for the benefit of" demonstrates the intent to create a trust. Restatement (Second) of Trusts § 24 cmt. b, illus. 1 (1959). The drafters of the Colorado Constitution used this language in reference to the school lands granted by the Enabling Act:

> The general assembly shall, at the earliest practicable period, provide by law that the several grants of land made by Congress to the State shall be judiciously located and carefully preserved and *held in trust* subject to disposal, *for the use and benefit of* the respective objects for which said grants of land were made . . ."

1876 Colo. Const. art IX, § 10 (emphasis added). The *Branson* court reasoned that the drafters' use of this language demonstrated the state's implicit acknowledgement that Congress granted the school lands in trust: "By requiring that Colorado's legislators quickly pass laws to enforce certain fiduciary obligations for the state, the 1876 Constitution supports the view that Coloradans perceived Congress' school land grant as more than a mere 'honorary' obligation, but rather as a legally enforceable fiduciary relationship." *Branson Sch. Dist.*, 161 F.3d at 635. The court therefore held that the school district and school children plaintiffs, as beneficiaries of the federal trust created by the Enabling Act, stated an injury under Article III because they had "a legally cognizable interest in the undivided loyalty of the school lands trustees." *Id.* at 631.

■ While we are bound by the United States Supreme Court's interpretations of federal law, we are not bound by decisions of lower federal courts. *Hill v. Thomas,* 973 P.2d 1246, 1255 (Colo.1999); *aff'd, Hill v. Colorado,* 530 U.S. 703, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000). Nonetheless, we find

the analysis of the Tenth Circuit in *Branson* persuasive. The specific language of section 14 gives enough import to the general grant language of section 7 to create a trust. Congress intended the Enabling Act to create more than an honorary obligation because it specified a minimum price for the sale of school land, mandated that the proceeds from such sales be put in a "permanent school-fund," and directed that the interest from that fund "be expended in the support of common schools." Colorado Enabling Act, § 14. Thus, we hold that the Colorado Enabling Act creates a federal trust.

We therefore turn to the question of whether it was error for the court of appeals to conclude that the Ranch has standing as a beneficiary of that trust because the public at large is the intended beneficiary of the trust. *East Lake Creek Ranch,* 998 P.2d at 49.

The *Branson* court held that the common schools are the "sole and exclusive beneficiary of the school lands trust." *Branson Sch. Dist.,* 161 F.3d at 637. We agree. Section 7 grants the school lands "for *the support of the common schools.*" Enabling Act § 7 (emphasis added). Section 14 sets forth requirements for the sale of the land "granted for *the support of common schools,*" establishes a permanent school fund, and requires the interest from that fund "to be expended in *the support of common schools.*" Enabling Act § 14 (emphasis added). These provisions indicate Congress's intent that the state's fiduciary obligations are not to support the citizens of the state as a whole but instead to support "the common schools." We therefore hold that the state's common schools (or public school districts) [10] are the sole and exclusive beneficiary of the school lands trust.

■ A trustee has a duty to administer the trust solely in the interest of the trust beneficiary. Restatement (Second) of Trusts § 170. Only a beneficiary or one suing on his or her behalf can maintain a suit against the trustee to enforce trust responsibilities or to enjoin or obtain redress for a breach of trust. Restatement (Second) of Trusts

---

**10.** "Today's public school districts are the direct political descendants of [the] 19th Century 'com-

mon schools.' " *Branson Sch. Dist.,* 161 F.3d at 629.

§ 200. "A person who incidentally benefits from the performance of a trust, but who is not a beneficiary, cannot maintain a suit against the trustee to enforce the trust." 3 A. Scott, The Law of Trusts § 200 at 209 (W. Fratcher ed., 4th ed.1987).

The Ranch is a limited liability partnership. It is not part of the public school system, nor is it in any meaningful way connected to the public schools. Hence, the Ranch does not have standing as a beneficiary of the school lands trust to sue to enforce the terms of the trust.

## III. CONCLUSION

The Ranch does not have standing as an adjacent landowner, as a taxpayer, or as a beneficiary of the school lands trust. Hence, we reverse the court of appeals and return this case to that court with directions to return it to the trial court to dissolve the injunction and dismiss the complaint.