Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's
homepage at http://www.courts.state.co.us. Opinions are also
posted on the Colorado Bar Association's homepage at
http://www.cobar.org.

ADVANCE SHEET HEADNOTE
February 21, 2023

**2023 CO 8**

**No. 21SC393, *Colorado Property Tax Administrator v. CO$_2$ Committee, Inc.* —
Oil and Gas — Property Taxation — Standing — Statutory Construction.**

In this case, the supreme court considers whether nonoperating fractional

interest owners in a unitized oil and gas operation have standing to independently

challenge a county's retroactive property tax increase. After examining the

statutory scheme and administrative guidance related to the taxation of oil and

gas leaseholds, the court concludes that article 7 of title 39 creates a unique

representative system in which a unit operator is the sole entity with standing to

protest a retroactive assessment on the unit it operates. Because a unit operator is

the sole point of contact throughout the reporting, notice, and taxpaying process,

the court holds that nonoperating fractional interest owners do not have a legally

protected interest in the valuation and taxation of their oil and gas leaseholds and

lands and, therefore, lack standing to challenge a retroactive assessment and

property tax increase.

# The Supreme Court of the State of Colorado
2 East 14th Avenue • Denver, Colorado 80203

---

## 2023 CO 8

---

### Supreme Court Case No. 21SC393
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 19CA1798

---

### Petitioner:

Colorado Property Tax Administrator,

v.

### Respondent:

CO₂ Committee, Inc.

---

### Judgment Reversed
*en banc*
February 21, 2023

---

**Attorneys for Petitioner:**
Philip J. Weiser, Attorney General
Robert H. Dodd, First Assistant Attorney General
Jessica E. Ross, Assistant Attorney General
Danny Rheiner, Assistant Attorney General
*Denver, Colorado*

**Attorney for Respondent:**
John M. Cogswell
*Buena Vista, Colorado*

**JUSTICE BERKENKOTTER** delivered the Opinion of the Court, in which **CHIEF JUSTICE BOATRIGHT**, **JUSTICE MÁRQUEZ**, **JUSTICE HOOD**, **JUSTICE GABRIEL**, **JUSTICE HART**, and **JUSTICE SAMOUR** joined.

JUSTICE BERKENKOTTER delivered the Opinion of the Court.

¶1　In this oil and gas leasehold taxation case, we address whether nonoperating fractional interest owners in a unitized oil and gas operation have standing to independently challenge a county's retroactive property tax increase. We conclude that they do not.

¶2　$CO_2$ Committee, Inc. ("$CO_2$") is a nonprofit corporation whose membership is comprised of nonoperating owners of fractional interests in the McElmo Dome unit, a consolidation of working interests in a large deposit of pure carbon dioxide in Montezuma County and Dolores County, near the Four Corners area of Colorado. Kinder Morgan $CO_2$ Company, L.P. ("Kinder Morgan") is the operator of the unit. Following an audit for the 2008 tax year, Montezuma County determined that Kinder Morgan had underreported the value of gas produced at the unit's leaseholds by improperly deducting certain costs that it, as the unit operator, was not entitled to deduct. The county ultimately increased its valuation of the entire unit by approximately $57 million. The Montezuma County assessor then imposed a retroactive tax assessment on the unit totaling more than $2 million based on that increased value. That prompted Kinder Morgan to challenge—ultimately unsuccessfully—the county's authority to impose the retroactive tax. *Kinder Morgan $CO_2$ Co. v. Montezuma Cnty. Bd. of Comm'rs*, 2017 CO 72, ¶ 2, 396 P.3d 657, 660 (concluding that the statutory scheme authorized the retroactive tax).

3

¶3　After we decided *Kinder Morgan*, CO₂ challenged the same retroactive property tax increases, arguing that Montezuma County violated its members' due process rights by failing to provide individual notice of and an opportunity to separately challenge the retroactive assessment and increased property tax. The trial court dismissed CO₂'s case for lack of standing. CO₂ appealed, and a division of the court of appeals reversed, concluding that CO₂'s members were taxpayers with standing to pursue the claims asserted in the complaint. *CO₂ Comm., Inc. v. Montezuma Cnty.,* 2021 COA 36M, ¶ 20, 491 P.3d 516, 521–22. We now reverse the division's judgment and hold that nonoperating fractional interest owners lack standing to independently challenge a retroactive assessment and property tax increase assessed against a unitized oil and gas operation. We reach this conclusion after examining the statutory scheme and administrative guidance related to the taxation of oil and gas leaseholds and determining that article 7 of title 39 creates a unique representative system in which a unit operator is the sole entity with standing to protest a retroactive assessment of tax on the unit it operates.

## I.  Background

¶4　An estate in oil and gas is a form of real property. § 24-65.5-101, C.R.S. (2022); § 39-1-102(14)(b), C.R.S. (2022). "Unlike most real property interests, however, the value of an oil and gas leasehold interest comes not from the physical

space or land the leasehold occupies, but rather, from the quantity and value of oil and gas underground." *Kinder Morgan*, ¶ 4, 396 P.3d at 660.

¶5    When the owner of a mineral estate leases the right to extract oil and gas from the land, the lease can create either a working interest, in which the lessee has the right to enter the land and extract minerals, or a royalty interest, in which the lessee does not have the right to enter the land but is entitled to a portion of the minerals extracted or the proceeds from that portion. *Id.*; *see* 1 Patrick H. Martin & Bruce M. Kramer, *Williams & Meyers, Oil and Gas Law* §§ 202.2–202.3, LexisNexis (database updated Nov. 2022). Nonoperating interest owners may take their "production in kind" — that is, taking their proportionate share of the mineral estate and selling it themselves — or they may rely on another party to market the minerals and take their proportionate share of the resulting proceeds. *See* 6 Patrick H. Martin & Bruce M. Kramer, *Williams & Meyers, Oil and Gas Law* § 921.11, LexisNexis (database updated Nov. 2022); *see, e.g.*, John Burritt McArthur, *The Restatement (First) of the Oilfield Operator's Fiduciary Duty*, 45 Nat. Res. J. 587, 679–80 (2005); 3 Colo. Div. of Prop. Tax'n & Dep't of Loc. Affs., *Assessor's Reference Library: Real Property Valuation Manual* ("3 ARL") 6.25 (Rev. Jan. 2023) (defining "Take-In-Kind").

¶6    These types of geological resources are often developed as a "unit." A "unit" in the oil and gas context is "a consolidation of working interests that extract

resources from a single geological reservoir." *Kinder Morgan,* ¶ 12 n.4, 396 P.3d at 662 n.4; *see also* § 39-10-106(5), C.R.S. (2022) ("'[U]nit' means any single oil, gas, or other hydrocarbon well or field which has multiple ownership, or any combination of oil, gas, or other hydrocarbon wells, fields, and properties consolidated into a single operation, whether by a formal agreement or otherwise . . . ."). "Units are created for the purpose of efficiently extracting resources from the reservoir through coordinated engineering and operation." *Kinder Morgan*, ¶ 12 n.4, 396 P.3d at 662 n.4. And, though the fractional interests in a unit may be owned by many entities, a single unit operator often handles the day-to-day operations. *Id.*; 3 ARL 6.25 (defining "[o]perator" as "any person responsible for the day-to-day operation of a well by reason of contract, lease, or operating agreement").

¶7 Once a year, every unit operator is responsible for preparing, signing, and filing a statement ("Annual Statement") with the local county assessor. § 39-7-101(1), C.R.S. (2022). The Annual Statement must include, among other things, the "selling price [of oil or gas] at the wellhead," also known as the "net taxable revenues." § 39-7-101(1)(d). This information is important because "[o]il and gas leaseholds are subject to taxation as real property," *Kinder Morgan*, ¶ 4, 396 P.3d at 660, and taxes for these leaseholds are determined based on the selling price at the wellhead, § 39-7-101(1)(d).

6

¶8 "The sale of unprocessed oil or gas, however, rarely occurs at the wellhead; instead, the oil or gas is typically gathered from multiple wells, processed, and transported away from the wellsite before sale." *Kinder Morgan*, ¶ 8, 396 P.3d at 661. "As a result, an operator typically must estimate its 'selling price at the wellhead' for purposes of section 39-7-101(1)(d) by deducting from its final, downstream selling price the costs of gathering, processing, and transporting the extracted material." *Kinder Morgan*, ¶ 8, 396 P.3d at 661 (quoting *Wash. Cnty. Bd. of Equalization v. Petron Dev. Co.*, 109 P.3d 146, 153 (Colo. 2005)); *see* § 39-7-101(1)(d) ("The net taxable revenues shall be equal to the gross lease revenues, minus deductions for gathering, transportation, manufacturing, and processing costs borne by the taxpayer pursuant to guidelines established by the [Property Tax Administrator].").

¶9 The assessor uses the Annual Statement to "value such oil and gas leaseholds and lands for assessment." § 39-7-102(1), C.R.S. (2022). The assessment is then used to calculate property taxes. *See* §§ 39-7-101 to -102; *Kinder Morgan*, ¶ 7, 396 P.3d at 661.

¶10 Unit operators are responsible for collecting these taxes from all of the nonoperating fractional interest owners and remitting the total amount owed to the county treasurer. § 39-10-106(2).

## II. Facts and Procedural History

¶11 Kinder Morgan is a 44% fractional interest owner in the McElmo Dome unit. The members of $CO_2$ are nonoperating working interest owners who collectively own an 11.224% fractional interest in the unit.[1] Many other entities own fractional interests, either working interests or royalty interests, in the unit. As the operator of the McElmo Dome unit, Kinder Morgan extracts and compresses carbon dioxide and then transports it by pipeline to Texas where it is sold for use in oil and gas operations. Kinder Morgan also pays for the unit's facilities and equipment, supplies labor, and bills the other fractional interest owners for expenses associated with operating the unit and arranging for transportation of the carbon dioxide to the point of sale. Further, as the unit operator, Kinder Morgan files the Annual Statement for the unit and pays the entire amount of property taxes due on behalf of all of the interest owners in the unit.

¶12 In 2009, the Montezuma County tax assessor ("the assessor") audited the Annual Statement that Kinder Morgan filed on behalf of the McElmo Dome unit for the 2008 tax year and determined that Kinder Morgan had underreported the value of gas produced at the unit's leaseholds by improperly deducting certain

---

[1] In this context, "nonoperating working interest owner" simply means any working fractional interest owner that is not also the unit operator.

costs that it, as the unit operator, was not entitled to deduct. The assessor, accordingly, retroactively increased its valuation of the unit by $57 million, which, in turn, increased the overall tax liability for the unit by more than $2 million. Kinder Morgan paid the additional tax bill and subsequently unsuccessfully appealed the retroactive assessment, *Kinder Morgan*, ¶¶ 40–41, 396 P.3d at 667–68, after which it appears to have charged the fractional interest owners for their proportionate share of the taxes.

¶13 Then, in January 2018—after Kinder Morgan lost on appeal—$CO_2$ filed an objection with the assessor, claiming that the assessor had wrongfully determined that $CO_2$'s members had underreported the selling price at the wellhead. According to $CO_2$, the assessor responded that it could not establish that $CO_2$'s members should be treated differently from Kinder Morgan for the purpose of computing the selling price at the wellhead and that separate special notices of valuation were never sent to $CO_2$'s members because the assessor was not required to do so. $CO_2$ next appealed to the County Board of Equalization pursuant to sections 39-8-106, C.R.S. (2022), and 39-1-113, C.R.S. (2022). According to $CO_2$, the Board of Equalization responded that the assessor did not send notices of valuation to $CO_2$ or its members as they were not identified as Montezuma County taxpayers.

¶14 CO₂ then commenced this litigation, claiming that Montezuma County violated its civil rights under 42 U.S.C. § 1983 by failing to provide due process and an opportunity for $CO_2$'s members to separately challenge the retroactive assessment and property tax increase. Montezuma County filed a motion to dismiss, arguing that, as pertinent here, $CO_2$'s members were not responsible for paying the taxes and thus did not have standing to seek abatement. The trial court granted Montezuma County's motion and dismissed $CO_2$'s complaint.

¶15 CO₂ appealed, and a unanimous division of the court of appeals reversed. *CO₂ Comm.*, ¶ 4, 491 P.3d at 519. The division concluded that $CO_2$ had standing because it suffered an injury in fact and because it had a legally protected interest. *Id.* at ¶¶ 34, 37, 491 P.3d at 523. In concluding that $CO_2$ had a legally protected interest, the division explained that "each nonoperating fractional interest owner who pays taxes is entitled to the panoply of rights afforded a 'property owner,' 'person,' or 'taxpayer' under the review, audit, protest, abatement, and appeal procedures detailed in the statutes and guidelines." *Id.* at ¶ 37, 491 P.3d at 523.

¶16 The Colorado Property Tax Administrator (the "Administrator") filed a motion to intervene, which we granted, and petitioned for certiorari review. We granted certiorari.[2]

### III. Standing Analysis

¶17 The sole issue before us is whether nonoperating fractional interest owners in an oil and gas unit have standing to independently challenge a retroactive assessment and property tax increase. We conclude that they do not.

### A. Standard of Review

¶18 "Whether a plaintiff has standing to sue is a question of law that we review de novo." *Barber v. Ritter*, 196 P.3d 238, 245 (Colo. 2008). "In determining whether standing has been established, we accept as true all material allegations of fact in the complaint." *Reeves-Toney v. Sch. Dist. No. 1*, 2019 CO 40, ¶ 20, 442 P.3d 81, 85.

### B. Standing Principles

¶19 "Standing is a threshold issue that must be satisfied in order for a court to decide a case on the merits." *Id.* at ¶ 21, 442 P.3d at 85. A standing inquiry assesses a litigant's right to raise a legal claim. *City of Greenwood Vill. v. Petitioners for the*

_____

[2] We granted certiorari on the following issue: "Whether the court of appeals erred in holding that nonoperating fractional interest owners in an oil and gas unit have standing to separately challenge a retroactive assessment of tax on the unit, apart from the designated unit operator."

11

*Proposed City of Centennial*, 3 P.3d 427, 436 (Colo. 2000). To have standing, a plaintiff must demonstrate that (1) they have suffered an injury in fact from the challenged action and (2) the injury is to a legally protected interest. *Ainscough v. Owens*, 90 P.3d 851, 855 (Colo. 2004).

¶20 Our standing test includes a constitutional requirement and a prudential requirement. *Id.* at 855–56. Article III of the Colorado Constitution requires a plaintiff to demonstrate that they have suffered an injury in fact as a result of the challenged action. *Id.* The injury-in-fact requirement mandates that the plaintiff's alleged injury is not "overly 'indirect and incidental' to the defendant's action." *Id.* at 856 (quoting *Brotman v. E. Lake Creek Ranch, L.L.P.*, 31 P.3d 886, 890–91 (Colo. 2001)). Our jurisprudence also requires that the plaintiff's injury be to a legally protected interest. *Id.* at 855. Under the legally-protected-interest prong, the question is "whether the plaintiff has a claim for relief under the constitution, the common law, a statute, or a rule or regulation." *Id.* at 856. If a party fails to satisfy either one of those two requirements, it lacks standing. *See id.* at 855.

## C. Application

¶21 Next, we turn to examine whether nonoperating fractional interest owners in a unitized oil and gas operation have a legally protected interest in the retroactive assessment of tax on the unit. To do this, we first discuss our rules of

12

statutory construction; we then lay out the pertinent statutory and administrative provisions in detail; and, finally, we explain our interpretation of those provisions.

### 1. Principles of Statutory Construction

¶22 We review questions of statutory interpretation de novo. *McCoy v. People*, 2019 CO 44, ¶ 37, 442 P.3d 379, 389. "Our primary task in construing a statute is to effectuate the intent of the General Assembly." *Kinder Morgan*, ¶ 24, 396 P.3d at 664. We give words and phrases their plain and ordinary meanings and read a statutory scheme as a whole, "giving consistent, harmonious, and sensible effect to all of its parts." *People in Int. of A.C.*, 2022 CO 49, ¶ 10, 517 P.3d 1228, 1233 (quoting *McCoy*, ¶ 38, 442 P.3d at 389). "If the statute is unambiguous—that is, not open to multiple interpretations—then our work is done." *Id.*, 517 P.3d at 1234. We apply the same rules when construing an administrative regulation. *Regular Route Common Carrier Conf. of Colo. Motor Carriers Ass'n v. Pub. Utils. Comm'n*, 761 P.2d 737, 745 (Colo. 1988).

### 2. Property Tax Assessment of Oil and Gas Leaseholds

¶23 To ensure uniform taxation premised on uniform assessment of property values, the General Assembly enacted article 7 of title 39, which governs the valuation of oil and gas leaseholds and lands. *Yuma Cnty. Bd. of Equalization v. Cabot Petroleum Corp.*, 856 P.2d 844, 848 (Colo. 1993); *see also* § 39-1-103(2), C.R.S. (2022); *see generally* §§ 39-7-101 to -110, C.R.S. (2022). Other statutory provisions

13

outside of article 7 also govern the taxation of oil and gas leaseholds; some apply more broadly to all property taxation, *see, e.g.*, § 39-5-122, C.R.S. (2022), and some specifically apply in the oil and gas context, *see, e.g.*, § 39-5-121(1.5)(b)(I), C.R.S. (2022); § 39-10-106. The General Assembly has additionally granted authority to the Administrator to publish "manuals, appraisal procedures, and instructions . . . concerning methods of appraising and valuing land" and "guidelines . . . concerning the audit and compliance review of oil and gas leasehold properties for property tax purposes." § 39-2-109(1)(e), (k), C.R.S. (2022).

¶24 Pursuant to that authority, the Administrator publishes the Assessor's Reference Library ("ARL"), a series of manuals addressing Colorado property tax assessment. *See* Colo. Dep't of Loc. Affs., Assessor's Reference Library Manuals, https://cdola.colorado.gov/publications/assessors-reference-library-manuals [https://perma.cc/5RTH-JMSA]. County assessors are required to comply with these manuals, procedures, instructions, and guidelines. § 39-2-109(1)(k); *Huddleston v. Grand Cnty. Bd. of Equalization*, 913 P.2d 15, 17 (Colo. 1996) ("[T]he manuals are binding on the county assessors.").

¶25 To understand the parties' arguments, it is necessary to take a quick tour of how unitized oil and gas operations are valued and taxed and how audits, tax protests, and retroactive assessments work.

### a. Assessor Valuation and Protest Procedures

¶26 As noted, section 39-7-101(1) requires unit operators to prepare and file the Annual Statement with the county assessor for each unit the operator manages that is producing or capable of producing oil or gas. The Annual Statement must be submitted by April 15 each year and include the following details:

(a) The wellhead location thereof and the name thereof . . . ;

(b) The name, address, and fractional interest of the operator thereof;

(c) The number of barrels of oil, or the quantity of gas . . . sold or transported from the wellhead during the calendar year immediately preceding . . . ;

(d) The selling price at the wellhead. . . . [;]

(e) The name, address, and fractional interest of each interest owner taking production in kind . . . ;

(f) A declaration made under the penalty of perjury . . . .

§ 39-7-101(1).

¶27 The county assessor then values the entire unit based on the information contained in the Annual Statement submitted by the unit operator. § 39-7-102(1). The assessor "send[s] the notice of valuation only to the operator, who shall accept it." § 39-5-121(1.5)(b)(I). The unit operator's acceptance of notice, however, "shall not be construed as an indication that the operator agrees with the amount of the actual value of the property stated in the notice or as obligating the operator to

pay the tax attributable to property in which the operator has no ownership interest." *Id.*

¶28 Section 39-5-122(2), which applies generally to all property taxation, provides that "[i]f any person is of the opinion that his or her property has been valued too high, . . . he or she may appear before the assessor and object, complete the form mailed with his or her notice of valuation . . . , or file a written letter of objection and protest" with the assessor. *See also* 2 Colo. Div. of Prop. Tax'n & Dep't of Loc. Affs., *Assessor's Reference Library: Administrative & Assessment Procedures Manual* ("2 ARL") 5.1 (Rev. Jan. 2023) ("If a taxpayer disagrees with the value assigned by the assessor, the taxpayer may file a protest during the statutory protest period.").

¶29 Then, "[a]ny person" whose objection is denied by the assessor can appeal to the county board of equalization. § 39-5-122(3). If the appeal is denied by the board of equalization, the person has the right to appeal to the Board of Assessment Appeals or to the district court. § 39-8-108(1), C.R.S. (2022); 2 ARL 5.6. Title 39 broadly defines "[p]erson" as "natural persons, corporations, partnerships, limited liability companies, associations, and other legal entities which are or may become taxpayers by reason of the ownership of taxable real or personal property." § 39-1-102(9).

## b. Payment and Abatement

¶30     Although only the unit operator submits the Annual Statement, each fractional interest owner is liable for its proportional share of the unit's taxes. § 39-10-106(1).  The unit operator collects each fractional interest owner's share and remits the tax to the county treasurer.  § 39-10-106(2).  "The unit operator may deduct and withhold from royalty payments or any other payments made to any fractional interest owner . . . the estimated amount of the tax to be paid by such fractional interest owner."  *Id.*  If the operator fails to collect the tax, the county treasurer is not precluded "from utilizing lawful collection and enforcement remedies and procedures against the owner of any fractional interest to collect the tax owed by such owner."  § 39-10-106(4)(a).

¶31     Section 39-10-114(1)(a)(I)(A), C.R.S. (2022), also provides that a county treasurer may provide an abatement or refund of taxes if "a petition for abatement or refund is filed within two years after January 1 of the year following the year in which the taxes were levied."  *See also* 2 ARL 5.13–5.16.

## c. Audit and Retroactive Assessment

¶32     County treasurers also have the authority to audit taxpayers and impose retroactive assessments.  *See* § 39-10-101(2)(a)(I), C.R.S. (2022); § 39-5-125(1), C.R.S. (2022); *see also Kinder Morgan*, ¶ 25, 396 P.3d at 664.  If a treasurer discovers that

17

taxable property has been omitted in the valuation process, the treasurer may value the omitted property for assessment. § 39-10-101(2)(a); § 39-5-125(1).

¶33 The ARL also sheds light on this process. It explains that counties may establish audit procedures for determining the actual value of oil and gas leaseholds and lands and lays out several requirements for doing so. It provides, in pertinent part, that the county assessor must mail a letter to the taxpayer "indicating that an 'audit' of that taxpayer's oil and gas declaration" will occur. 3 ARL 6.56. When the audit is complete, the county must (1) "[m]ail[] a notice of preliminary 'audit' findings to the taxpayer at the address recorded on the annual declaration," (2) give the taxpayer thirty days to submit additional information, (3) consider that additional information, and (4) provide a listing of the taxpayer's audit rights. 3 ARL 6.57.

### 3. CO$_2$'s Alleged Legally Protected Interest

¶34 The Administrator argues that the division erred in concluding that nonoperating fractional interest owners have a legally protected interest in the valuation and taxation of their oil and gas leaseholds and lands. *See CO$_2$ Comm.*, ¶ 73, 491 P.3d at 529. In the Administrator's view, these owners are not taxpayers and thus not entitled to all of the rights provided to taxpayers under the statute. *See id.* at ¶ 72, 491 P.3d at 529.

¶35 More specifically, she contends that property taxes on these types of oil and gas interests are based on a representative system where the unit operator is the sole point of contact for reporting, notice, and taxpaying purposes. The Administrator asserts that the General Assembly created this system to make the operator alone responsible for paying taxes on behalf of the entire unit and that the division's opinion essentially disregards that system. We agree that article 7 creates a representative system for oil and gas leaseholds and lands, in which the unit operator serves as the sole taxpayer. *See* § 39-7-101(1).

¶36 The many statutes outlining the unit operator's unique role demonstrate the General Assembly's intent in this regard. For instance, section 39-7-101(1) explicitly provides that the operator files the Annual Statement "for the . . . unit."[3] Fractional interest owners have no obligation to do so unless there is no unit operator. *Id.* And while any nonoperating fractional interest owner may report, by March 15 of each year, its "actual net taxable revenues received at the wellhead

---

[3] Although section 39-10-106(4)(a) provides that a treasurer may collect taxes directly from a fractional interest owner, it may only do so if the unit operator fails to collect and remit the tax from the fractional interest owners. That provision does not demonstrate the General Assembly's intent to disrupt its representative structure; rather, it is a practical provision that allows a treasurer to collect payment in the event that the operator fails to satisfy its statutory obligation. *See id.*

and the actual exempt revenues received at the wellhead by such owner for production taken in kind from the property during the calendar year immediately preceding," it reports that information to the unit operator, *not* to the assessor. § 39-7-101(1.5). When a nonoperating fractional interest owner provides this information to the unit operator, the unit operator shall use this information to determine the selling price at the wellhead for that owner, *id.*, thus giving the owner an opportunity to weigh in on the Annual Statement as to its proportionate share *through* the unit operator. Taxes for the unit are then determined based on the price reported by the unit operator. *See id.*; § 39-7-101(1); § 39-7-102(1); § 39-10-106(1).

¶37 The plain language of section 39-5-121(1.5)(b)(I) further supports our conclusion that the General Assembly intended the unit operator to represent the nonoperating fractional interest owners in the taxpaying process: "the assessor shall send the notice of valuation *only* to the operator." (Emphasis added.) Nonoperating fractional interest owners are thus not statutorily entitled to notice of valuation at the initial valuation stage. *See id.*

¶38 Read alongside sections 39-7-101 and 39-5-121(1.5)(b)(I), the statutory valuation protest procedure—which applies generally to all property-tax-valuation protests—also supports our conclusion. *See* § 39-5-122. That provision dictates that "any person" who disagrees with the valuation of "his or her

20

property" has three options to object. § 39-5-122(2). One of those options is to "complete the form mailed with his or her notice of valuation pursuant to section 39-5-121(1) or (1.5)." § 39-5-122(2). The entity with the authority to protest a valuation, then, must be the one that received the notice of valuation, and in this context, the only entity that receives notice of valuation is the unit operator. *See* § 39-5-121(1.5)(b)(I). Although "any person" may object, the meaning of "any person" must be limited by the context of the relevant statutes here to mean the unit operator. *See id.*

¶39 $CO_2$ essentially concedes that the statute contemplates the unit operator as the sole point of contact for the initial valuation and corresponding protest process but contends that those procedures do not apply to the "retroactive assessment" and "special notice of valuation" processes. It asserts that because there are no statutory provisions specifically governing oil and gas audits, the Administrator's contention that nonoperating fractional interest owners lack standing to challenge these assessments deprives them of due process. We disagree for two reasons.

¶40 First, we read statutes dealing with the same subject alongside one another, "giving consistent, harmonious, and sensible effect to all of their parts." *Kinder Morgan*, ¶ 24, 396 P.3d at 664. True, the statutory scheme does not specifically discuss audit procedures in the context of unitized oil and gas operations, but that does not mean that such procedures should be at odds with the overarching

21

statutory scheme for the valuation and taxation of oil and gas leaseholds. To the contrary, the General Assembly's decision to make the unit operator the sole point of communication with the assessor throughout the initial valuation and protest process demonstrates its intent to create a representative system in which the unit operator represents fractional interest owners at *every* stage of the property tax assessment process. Construing the statutory scheme as affording standing to nonoperating fractional interest owners in the audit and post-audit process would clearly contravene that legislative intent.

¶41 Second, the ARL's oil and gas audit procedures support our conclusion that nonoperating fractional interest owners lack standing, and the Administrator's construction of these statutes warrants our deference. *See El Paso Cnty. Bd. of Equalization v. Craddock*, 850 P.2d 702, 704–05 (Colo. 1993) (explaining that although courts are not bound by agency interpretations, courts afford deference to such interpretations, especially "when the subject involved calls for the exercise of technical expertise which the agency possesses and when the statutory language is susceptible to more than one reasonable interpretation").

¶42 Those procedures provide that the assessor "provides a letter to the taxpayer . . . indicating that an 'audit' of that taxpayer's oil and gas declaration" will occur. 3 ARL 6.56. The "taxpayer" here *must* be the unit operator because the

22

unit operator is the one who files the Annual Statement.[4]  *See* § 39-7-101(1).

Fractional interest owners do not file a separate statement with the assessor, so if

the fractional interest owners were the "taxpayer[s]," the assessor would have

nothing to audit.  *See id.*

¶43    Yet another provision in the ARL further supports our conclusion.  On

completion of the audit, the ARL requires the assessor to "[m]ail[] a notice of

preliminary 'audit' findings to the taxpayer at the address recorded on the annual

declaration."  3 ARL 6.57.  But because section 39-7-101(1) only requires that the

Annual Statement include the address of the unit operator and of the fractional

interest owners taking production in kind, the statute excludes all of those

fractional interest owners who do *not* take their production in kind.  Thus, if we

construe "taxpayer" expansively, as $CO_2$ suggests, to include all fractional interest

owners, we would be requiring the assessor to mail notices of preliminary findings

to fractional interest owners who are not identified in the Annual Statement.  *See*

§ 39-7-101(1).  That interpretation would be illogical.  *See McCoy*, ¶ 38, 442 P.3d at

---

[4] The ARL uses the term "declaration" rather than "statement," but that term
should be read synonymously with "statement" as it appears in section 39-7-101.
*See* 3 ARL 6.21 ("Section 39-7-101, C.R.S., requires every operator or owner . . . to
file a statement with the county assessor . . . . The statement is an Oil and Gas Real
and Personal Property Declaration Schedule . . . .").

389 ("[W]e must avoid constructions that would . . . lead to illogical or absurd results.").

¶44 Finally, the recent enactment of clarifying legislation further bolsters our interpretation of the statutory scheme. After the division published its opinion, the General Assembly passed S.B. 22-026 to clarify the role of the unit operator:

> Notwithstanding any other provision of law, the partial interests of oil and gas fractional interest owners are not subject to separate valuation by the assessor and shall be represented by the well or unit operator of each wellsite. The well or unit operator is the sole point of contact for all notification, review, audit, protest, abatement, and appeal procedures.

Ch. 58, sec. 2, § 39-7-110(2), 2022 Colo. Sess. Laws 265, 265–66. Both the legislative history and the plain language of the statute demonstrate the General Assembly's intent to clarify the statute rather than to change it. *See id.*; Hearing on S.B. 22-026 before the S. Fin. Comm., 73rd Gen. Assemb., Reg. Sess. (Feb. 9, 2022) (statements of Sens. Ginal and Kirkmeyer); Hearing on S.B. 22-026 before the H. Fin. Comm., 73rd Gen. Assemb., Reg. Sess. (Mar. 10, 2022) (statements of Reps. Boesenecker and Rich); *see also Acad. of Charter Schs. v. Adams Cnty. Sch. Dist. No. 12*, 32 P.3d 456, 464 (Colo. 2001) (explaining that although we usually presume that the General Assembly intends to change a law by amending it, that presumption is rebuttable if the legislature intended only to clarify an ambiguity in the law); *Vensor v. People*, 151 P.3d 1274, 1279 (Colo. 2007) ("[T]he testimony of a bill's sponsor concerning its purpose and anticipated effect can be powerful evidence of legislative intent.").

24

¶45 That the General Assembly chose to clarify that fractional interest owners are not subject to independent valuation or notice only after the division published its decision concluding otherwise is instructive. To hold that fractional interest owners have standing in the audit and protest process in light of this amendment would clearly contravene the intent of the General Assembly.

¶46 For these reasons, we conclude that the "taxpayer" as contemplated by the pertinent statutes and the ARL's audit procedures *must* be the unit operator.

## IV. Conclusion

¶47 Because $CO_2$ lacks a legally protected interest, it lacks standing to challenge Montezuma County's retroactive assessment and increased property taxes. This conclusion aligns with the General Assembly's carefully crafted statutory system, which designates the unit operator as the representative for the fractional interest owners throughout the unitized oil and gas property tax process. Accordingly, we reverse the division's judgment and affirm the trial court's order granting Montezuma County's motion to dismiss.